## MANAGEMENT SERVICES AGREEMENT

This MANAGEMENT SERVICES AGREEMENT (this "Agreement") is made and entered into as of 02/04, 2025 (the "Effective Date"), by and between PARAMOUNT PHARMACY GROUP LLC, a New Jersey limited liability company with an address of 377 Hoes Lane, Suite 105, Piscataway, New Jersey 08854 (the "**Service Provider**"), and HEALTH HAVEN CORP. (d/b/a Prescription Plus Pharmacy), a New York corporation with an address of 105 Croton Avenue, Ossining, New York 10562 (the "**Company**"). Service Provider and the Company are sometimes referred to herein individually as a "Party" and collectively as the "Parties."

WHEREAS, the Company desires to retain Service Provider to provide certain management and administrative services to the Company, and Service Provider is willing to provide such management and administrative services to the Company, upon the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the foregoing, the terms and conditions hereinafter set forth, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto hereby agree as follows:

1.    **Retention of Service Provider; Services**. The Company hereby retains Service Provider, and Service Provider hereby agrees to provide to the Company certain management and administrative support services (the "Services") which include, without limitation, the following: (i) general management, oversight and administration of the Company's business, (ii) billing services, (iii) accounting services, (iv) inventory assessment, (v) staffing, (vi) marketing and branding for Company, (vii) audit assistance, (viii) general upkeep and upgrading of facilities, and, (ix) such other management and administrative services which the parties shall mutually determine are necessary for the efficient operation of the Company's business and affairs. The Parties agree that the Services shall be provided by the employees of Service Provider or third party providers hired by Service Provider. The Service Provider shall have and exercise absolutely no control or supervision over the Company's pharmacist in charge or the practice of pharmacy by the Company. While the Service Provider may recommend candidates to be employed by the Company as the pharmacist in charge, whether or not to hire such candidates shall be solely up to the Company and the pharmacist in charge shall be an employee of the Company, not the Service Provider, and be employed for at least thirty-five (35) hours per week or greater. The Service Provider shall perform the Services in accordance with the Company's policies and procedures, including the Company's quality improvement program.

2.    **Employees**.

  2.1. At no time shall Service Provider's employees, independent contractors, and/or the employees of any such independent contractors be considered employees of the Company. Service Provider shall be responsible for complying with all federal, state and local labor and tax laws and regulations with respect to its employees and independent contractors.

  2.2. Further, at no time shall Company's employees, independent contractors, and/or the employees of any such independent contractors be considered

IN Service Provider

Company

Paramount Pharmacy Group LLC v. Iqbal
Case No. 7:25-cv-04780-CS
Exhibit 4 - Page 1 of 23

employees of Service Provider. Company shall be responsible for complying with all federal, state and local labor and tax laws and regulations with respect to its employees and independent contractors.

3.   **Appointment of Service Provider as Agent**. For the purpose of this Agreement and the services to be rendered, Service Provider is appointed the agent on behalf of Company with regard to the Service Provider's scope of services.

    3.1.   The Parties hereto understand that Service Provider requires certain access to information and systems to perform its duties.

    3.2.   Company agrees and assents to granting Service Provider access to the following: (1) the pharmacy (location) with unimpeded ability to inspect the premises; (2) Company bank accounts and to be added as an authorized bank account user; (3) Company's pharmacy software accounts and to be added as an authorized software account user; (4) Company's email accounts; and (5) pharmacy's security cameras. Further, Company agrees and assents to the terms of the annexed Power of Attorney.

    3.3.   The Parties further agree that none of the above accesses, including the Power of Attorney (the "POA"), shall be removed or revoked unilaterally by Company. If any of the above accesses or the POA are unilaterally removed or revoked by Company, same shall be a material breach of this Agreement.

4.   **Duties of Service Provider**.

    4.1.   Service Provider will perform, or cause to be performed, the Services hereunder with not less than the degree of care, skill and diligence with which it performs or would perform similar services for itself consistent with past practices (including, without limitation, with respect to the type, quantity, quality and timeliness of such services). If the Service Provider is required to engage third parties to perform one or more of the Services required hereunder, Service Provider shall use all commercially reasonable efforts to cause such third parties to deliver such Services in a competent and timely fashion.

    4.2.   Service Provider will provide guidance to Company concerning business operations and suggest appropriate policies and procedures.

    4.3.   Service Provider shall maintain books, records, documents and other written evidence, consistent with its normal accounting procedures and practices, sufficient to accurately, completely and properly reflect the performance of the Services hereunder and the amounts due in accordance with any provision of this Agreement (collectively, the "Services Evidence").


Service Provider


Company

Paramount Pharmacy Group LLC v. Iqbal
Case No. 7:25-cv-04780-CS
Exhibit 4 - Page 2 of 23

5.    **Term**.

5.1.    The term of this Agreement shall commence as of the Effective Date and shall continue in effect for five years (the "Initial Term"), and thereafter shall be automatically renewed upon the same terms and conditions set forth herein for subsequent five year terms (each, a "Renewal Term") unless Service Provider or the Company gives notice in writing within ninety (90) days before the expiration of the Initial Term or any Renewal Term of its desire to terminate this Agreement for cause; provided, however, that either the Company or Service Provider will have the right to terminate this Agreement following a breach of a material term of this Agreement by the other party hereto and a failure to cure such breach within 30 days following written notice thereof. The Initial Term and any Renewal Terms are referred to herein collectively as the "Term".

5.2.    Notwithstanding Section 5.1, the Parties agree that this Agreement will terminate upon (i) the liquidation or dissolution of the Company, (ii) the sale of all or substantially all of the assets of the Company to a third party or (iii) the sale of control of the Company, whether by sale of membership interests, merger, reorganization, consolidation or otherwise, to a third party.

6.    **Compensation**.

6.1.    **Hourly Rate**. Company agrees to pay Service Provider by the hour for all time spent on the Services. Current hourly rates for Service Provider's personnel are as follows:

| | |
|---|---|
| CEO | $100/hour |
| Marketing Director | $75/hour |
| Manager | $50/hour |
| Laborer | $25/hour |

The time charged will include, but is not limited to, anything which is required of Service Provider to render the Services including communication with the Company, internal communication about the Services, and travel time in pursuit of the Services.

Time is charged in minimum units of one-tenth (. 1) of an hour.

6.2.    **Payment Terms**. Service Provider will deliver a monthly invoice (the "Invoice") to the Company as soon as practicable following the end of each month. The Company shall pay the Invoice within seven (7) days of receipt of such Invoice. Interest at the rate of 12% per annum, compounded monthly, will accrue and will be payable with respect to any amounts due and not paid by the Company until such amounts, and any interest thereon, have been paid.

 Service Provider

_____Company

Paramount Pharmacy Group LLC v. Iqbal
Case No. 7:25-cv-04780-CS
Exhibit 4 - Page 3 of 23

6.3. **Bonus**. An annual bonus shall be payable to Service Provider in an amount based on the below formula, which shall be deemed earned as of December 31, and to be paid within 60 days of the end of each calendar year:

6.3.1. 25% of all appreciation (a/k/a growth) of the gross revenue, year over year, wherein the initial prior year gross revenue is agreed to be set as $_____. To calculate the bonus amount, the formula is as follows: gross revenue for the current year ("A") minus gross revenue for the prior year ("B") multiplied by 25% ("C").
[(A minus B) multiplied by C].

6.3.2. "Appreciation" means a rise in value over time.

6.3.3. "Gross Revenue or gross revenue" is to be given its commonly accepted definition as used in the accounting industry which is monies generated or earned without deductions of any kind.

6.3.4. In the event of an instance where the formula (A minus B) yields a negative number, then in such case the bonus amount due will be zero (a/k/a nil).

6.4. **Form of Payment**. Each payment made pursuant to this Agreement will be paid by wire transfer of immediately available federal funds or certified cashier's check to such account as Service Provider may specify to the Company in writing prior to such payment.

6.5. The Parties hereto agree that the compensation set forth in this Section was arrived at through arms-length negotiations and reflects, to their knowledge, the fair market value of the Services.

7. **Restrictive Covenants**.

7.1. **Non-Competition**.

7.1.1. During the term of this Agreement and for a period of twenty-four (24) months immediately following the expiration or termination of this Agreement, Company and its Principal agree that they shall not, either alone or with others, directly or indirectly, as owner, stockholder, partner, lender, investor, director, officer, employee, independent contractor, consultant or otherwise open any new pharmacy without first advising Service Provider of same and giving Service Provider the opportunity to retain the new pharmacy as a client.

7.1.2. During the term of this Agreement and for a period of twenty-four (24) months immediately following the expiration or termination of this Agreement, Company and its Principal agree that they shall not, either alone or with others, directly or indirectly, as owner, stockholder,


Service Provider

Company

Paramount Pharmacy Group LLC v. Iqbal
Case No. 7:25-cv-04780-CS
Exhibit 4 - Page 4 of 23

partner, lender, investor, director, officer, employee, independent contractor, consultant or otherwise seek the services of any other management service provider or any business which provides the same or similar services as Service Provider.

    7.1.3.  During the term of this Agreement and for a period of twenty-four (24) months immediately following the expiration or termination of this Agreement Company and its Principal agree that they shall not, either alone or with others, directly or indirectly, as owner, stockholder, partner, lender, investor, director, officer, employee, independent contractor, consultant or otherwise engage in business with any other pharmacy, pharmacy owner, or pharmacy competitor located within 50 miles of Service Provider's location.

7.2.  **Non-Solicitation of Employees**. During the term of this Agreement and for a period of twenty-four (24) months immediately following the expiration or termination of this Agreement, Company and its Principal shall not, alone or with others, directly or indirectly, solicit for Company's benefit or the benefit of any person or organization other than the Service Provider, the employment or other services of any employee of the Service Provider, or of a previous employee of the Service Provider whose employment ended within twelve (12) months of the Agreement's termination date.

7.3.  **Liquidated Damages**. The Parties including Company's Principal agree that damages are difficult to calculate for a violation of any of the provisions this Section seven (7) and therefore agree to a liquidated damages clause in the amount of $500,000 (five hundred thousand dollars) are agreed to and appropriate.

8.    **Representations**.

8.1.  **Representations by Service Provider**. Service Provider warrants and represents that it has experience with operating pharmacies, staffing employees, pharmacists, and billing third party payers; that it abides by all Federal and State laws, rules and regulations for billing of pharmaceuticals; that it has no ethical complaints filed against it; and, carries all necessary insurances required by law.

8.2.  **Representations by Company**. Company warrants and represents that its ownership structure is as represented in all forms filed with the State Board of Pharmacy and all other governmental authorities; that it is and will continue to be properly licensed under all applicable Federal and State laws; that it does not engage in any illicit conduct from or with its pharmacy operations; that it abides by and follows all laws, rules and regulations pertaining to CDS pharmaceuticals; that it has liquid capital to cover all expenses and compensation which will arise pursuant to this Agreement; and, carries all necessary insurances required by law.

_____ Service Provider                                   _____ Company

Paramount Pharmacy Group LLC v. Iqbal
Case No. 7:25-cv-04780-CS
Exhibit 4 - Page 5 of 23

8.2.1.  Further, Company warrants and represents that it will not denude or destroy the assets of Company nor purposefully frustrate the purpose of this contract.

8.3.  **Representations by Both Parties**.  Both Parties represent that they are aware of the anti-steering provisions contained in the law, Anti-Fraud and Abuse Amendments to the Social Security Act, the Medicaid and Medicare Program Protection Act, the Federal and State Anti-Kickback Safe Harbor Regulations, the Federal and State Anti-Stark self referral laws, and all other applicable State laws, and further represent that they will act in accordance with such laws and regulations.

9.  **Confidentiality**.  The Parties acknowledge and agree that the terms of this Agreement and all documents produced by Service Provider during the course of providing the Services are confidential and shall not be publicized, disclosed or communicated, by the Parties or their officers, directors, managers, principals, members, employees, agents and representatives, to any third party without the prior written consent of the other Party, unless it or its attorneys are directed to do so by a court order, valid subpoena, or order of a federal, state, or local governmental agency. In the event any Party receives such an order, subpoena or other demand seeking disclosure of the terms of this Agreement, it shall promptly notify the other Parties so as to allow them sufficient time to seek to oppose the disclosure of the Agreement. Notwithstanding the foregoing, the Parties may also disclose the terms of this Agreement to their respective attorneys, accountants and insurers, and the United States Internal Revenue Service or any other governmental tax authority to the extent necessary for them to comply with the laws and regulations covering the payment of income tax. The Parties shall inform all such persons and entities that the terms of this Agreement are to be kept confidential and shall require such persons to safeguard such information so as to avoid any disclosure of that information, except as provided in this Agreement. This confidentiality clause is a material term of this agreement.

Service Provider agrees HIPAA information will never be used or disclosed by the Service Provider in violation of applicable law, including, but not limited to, HIPAA, Federal and State, this Agreement, the Company's Notice of Privacy Practices, and other limitations as put in place by Company. The intent of this section is to ensure that the Service Provider will use and access only the minimum amount of HIPAA information necessary to perform the Service Provider's duties and will not disclose protected information outside it's normal business operations unless expressly authorized in writing to do so by the Company. All HIPAA protected information received by Service Provider will be held and treated by it as confidential, and will not be disclosed in any manner whatsoever, in whole or in part, except as authorized by Company and will not be used other than in connection with discharging duties on behalf of the Company.

10.  **Exculpation and Indemnification**.

10.1.  **Indemnification By Service Provider**.  Service Provider shall defend, indemnify and hold harmless Company and its respective members, stockholders, directors, officers and employees (as applicable) from and against all claims, judgments, damages, liabilities, settlements, losses, costs

\_\_\_\_\_ Service Provider

\_\_\_\_\_ Company

Paramount Pharmacy Group LLC v. Iqbal
Case No. 7:25-cv-04780-CS
Exhibit 4 - Page 6 of 23

and expenses, including attorneys' fees and disbursements, arising from or relating to:

    10.1.1. any inaccuracy in or breach of any of the representations or warranties of Service Provider contained in this Agreement;

    10.1.2. any purposeful breach or non-fulfillment of any covenant, agreement or obligation to be performed by Service Provider pursuant to this Agreement;

    10.1.3. any purposeful misrepresentation made or submitted to any third party payors, the State Board of Pharmacy, Medicare, State Medicaid, or any other governmental agency of any nature or description.

10.2. **Indemnification By Company**. Company shall defend, indemnify and hold harmless Service Provider, its affiliates and their members, stockholders, directors, officers and employees (as applicable) from and against all claims, judgments, damages, liabilities, settlements, losses, costs and expenses, including attorneys' fees and disbursements, arising from or relating to:

    10.2.1. any inaccuracy in or breach of any of the representations or warranties of Company contained in this Agreement or any document to be delivered hereunder;

    10.2.2. any breach or non-fulfillment of any covenant, agreement or obligation to be performed by Company pursuant to this Agreement or any document to be delivered hereunder;

    10.2.3. any fines, penalties or losses of any kind in connection with any audits, investigations, or inquiries conducted by third party payors, the State Board of Pharmacy, Medicare, State Medicaid, or any other governmental agency of any nature or description for any deficiencies or discrepancies or violation of law or regulation that arises from an action or inaction on the part of Company;

    10.2.4. any claim brought by any third-party involving a duty owed by Company to that third-party or the general public;

    10.2.5. any claim brought by any third-party touching or concerning an action or inaction on the part of the Company.

10.3. **Rights of Indemnification; Survival**. The rights of indemnification provided in this Section 10 shall be in addition to any rights to which a party entitled to indemnification under Sections 10.1 or 10.2 may otherwise be entitled by contract or as a matter of law, and shall extend to each of such party's heirs, successors and assigns. The provisions of this Section 10 shall survive the termination of this Agreement. The rights and remedies provided in this


Service Provider

_____ Company

Paramount Pharmacy Group LLC v. Iqbal
Case No. 7:25-cv-04780-CS
Exhibit 4 - Page 7 of 23

Section are cumulative and are in addition to and not in substitution for any other rights and remedies available at law or in equity or otherwise.

11. **Breach**. Each Party has the right to terminate this Agreement following a breach of a material term of this Agreement by the other party hereto and a failure to cure such breach within 30 days following written notice thereof. Any uncured material breach of this Agreement, by Company, shall be deemed a breach of the Secured Promissory Note between Company's shareholder/member and Paramount Pharmacy Group LLC.

12. **Assignment**. Only the Service Provider may assign any of its rights or delegate any of its duties under this Agreement without the prior written consent of the other Party.

13. **Choice of Law**. Except as set forth below, this Agreement shall be construed and interpreted, and the rights of the Parties shall be governed by, the internal laws of the State of New Jersey, without giving effect to conflicts of laws rules and principles that require the application of the laws of any other jurisdiction. The Parties further agree that personal jurisdiction and venue are proper in the state courts physically located in Union County, New Jersey and all Parties consent to personal jurisdiction therein.

14. **Entire Agreement; Amendments and Waivers**. This Agreement, together with all Exhibits and/or Schedules hereto, constitute the entire agreement between the Parties pertaining to the subject matter hereof and supersede all prior and contemporaneous agreements, understandings, negotiations and discussions, whether oral or written, of the Parties, and there are no other warranties, representations or other agreements between the parties in connection with the subject matter hereof. No amendment, supplement, modification or waiver of this Agreement shall be binding unless executed in writing by all Parties hereto. No waiver of any of the provisions of this Agreement shall be deemed to constitute a waiver of any other provision hereof (whether or not similar), nor shall such waiver constitute a continuing waiver unless expressly agreed to in writing by the affected Party.

15. **References; Headings; Interpretation**. All references in this Agreement to Exhibits, Articles, Sections, subsections and other subdivisions refer to the corresponding Exhibits, Articles, Sections, subsections and other subdivisions of or to this Agreement unless expressly provided otherwise. Titles appearing at the beginning of any Articles, Sections, subsections or other subdivisions of this Agreement are for convenience only, do not constitute any part of this Agreement, and shall be disregarded in construing the language hereof. The words "this Agreement," "herein," "hereby," "hereunder" and "hereof" and words of similar import refer to this Agreement as a whole and not to any particular subdivision unless expressly so limited. The words "this Article," "this Section" and "this subsection" and words of similar import refer only to the Article, Section or subsection hereof in which such words occur. The word "or" is not exclusive, and the word "including" (in its various forms) means "including, without limitation." Pronouns in masculine, feminine or neuter genders shall be construed to state and include any other gender, and words, terms and titles (including terms defined herein) in the singular form shall be construed to include the plural and vice versa, unless the context otherwise requires.

16. **Notices**. Unless otherwise provided herein, any notice, request, consent, instruction or other document to be given hereunder by any Party hereto to another Party hereto shall be in

 _____ Service Provider

_____ Company

Paramount Pharmacy Group LLC v. Iqbal
Case No. 7:25-cv-04780-CS
Exhibit 4 - Page 8 of 23

writing and will be deemed given: (a) when received, if delivered personally or by courier; or (b) on the date receipt is acknowledged, if delivered by certified mail, postage prepaid, return receipt requested; or (c) forty-eight (48) hours after transmission, if sent by electronic mail transmission with confirmation of transmission, as follows:

If to Company:

Attn: Muhammad Assad Iqbal
Health Haven Corp.
105 Croton Avenue
Ossining, New York  10562
e: iqbalassad@hotmail.com

If to Service Provider:

Attn: Ibrar Nadeem
Paramount Pharmacy Group LLC
377 Hoes Lane, Suite 105
Piscataway, New Jersey 08854
e: ceo@ppgrx.com

17.    **Counterparts**. This Agreement may be executed in one or more counterparts, including by facsimile and portable document format (.pdf) delivery, each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument. The Parties agree and acknowledge that delivery of a signature by facsimile or in .pdf form shall constitute execution by such signatory.

18.    **Invalidity**. In the event that any one or more of the terms or provisions contained in this Agreement or in any other instrument referred to herein shall, for any reason, be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or any other such instrument, and such invalid, illegal or unenforceable provision shall be interpreted so as to give the maximum effect of such term or provision allowable by law.

19.    **Additional Documents**. Each of the Parties hereto agree to execute any document or documents that may be requested from time to time by the other Party to implement or complete such Party's obligations pursuant to this Agreement and to otherwise cooperate fully with such other Party in connection with the performance of such Party's obligations under this Agreement. Annexed hereto and incorporated by reference as if stated at full length herein, the Parties execute "**Exhibit A**" (HIPAA Business Associate), "**Exhibit B**" (Right of First Refusal), and "**Exhibit C**" (Power of Attorney). This Agreement along with the annexed Exhibits are to be read in harmony to the fullest extent permitted by law.

20.    **Successors and Assigns**. Except as herein otherwise specifically provided, this Agreement shall be binding and inure to the benefit of the Parties and their successors, heirs and permitted assigns.

_____ Service Provider

_____ Company

Paramount Pharmacy Group LLC v. Iqbal
Case No. 7:25-cv-04780-CS
Exhibit 4 - Page 9 of 23

21.     **No Third-Party Beneficiaries**. This Agreement is solely for the benefit of the Parties hereto and their successors and assigns permitted under this Agreement, and no provisions of this Agreement shall be deemed to confer upon any other persons any remedy, claim, liability, reimbursement, cause of action or other right except as expressly provided herein.

22.     **Consultation With Counsel**.  Each of the Parties to this Agreement warrants and represents that it has had an opportunity to consult with counsel and is satisfied that it understands the terms and import of this Agreement. Company acknowledges that Vazquez Heldman LLC has acted as legal counsel to Service Provider in connection with this Agreement.

23.     **No Presumption Against Any Party**. Neither this Agreement nor any uncertainty or ambiguity herein shall be construed or resolved against any Party, whether under any rule of construction or otherwise. On the contrary, this Agreement has been reviewed by each of the Parties and their counsel and shall be construed and interpreted according to the ordinary meaning of the words used so as to fairly accomplish the purposes and intentions of all Parties hereto.

24.     **Specific Performance**. The Parties acknowledge and agree that any Party would be damaged irreparably in the event any of the provisions of this Agreement are not performed in accordance with their specific terms or otherwise are breached. Accordingly, the Parties agree that any Party shall be entitled to an injunction or injunctions to prevent breaches of the provisions of this Agreement and the annexed Exhibits and to enforce specifically this Agreement and the annexed Exhibits and the terms and provisions hereof.

IN WITNESS WHEREOF, the Parties hereto have caused this Management Services Agreement to be executed as of the day and year first written above.

**COMPANY**

HEALTH HAVEN CORP.
By: Muhammad Assad Iqbal, President on behalf of Health Haven Corp.

*AS TO SECTION 7 ONLY:*

Muhammad Assad Iqbal, Individually and Personally

**SERVICE PROVIDER**

PARAMOUNT PHARMACY GROUP LLC
By: Ibrar Nadeem, CEO on behalf of Paramount Pharmacy Group LLC

Paramount Pharmacy Group LLC v. Iqbal
Case No. 7:25-cv-04780-CS
Exhibit 4 - Page 10 of 23

## EXHIBIT A

[*HIPAA BUSINESS ASSOCIATE AGREEMENT*]



_____ Service Provider                    _____ Company

Paramount Pharmacy Group LLC v. Iqbal
Case No. 7:25-cv-04780-CS
Exhibit 4 - Page 11 of 23

# HIPAA Business Associate Agreement

By and between Paramount Pharmacy Group LLC and Health Haven Corp. (d/b/a Prescription Plus Pharmacy) as of this _04_ day of _02_ of 2025 (hereinafter "the effective date.").

## Definitions

Catch-all definition:

The following terms used in this Agreement shall have the same meaning as those terms in the HIPAA Rules: Breach, Data Aggregation, Designated Record Set, Disclosure, Health Care Operations, Individual, Minimum Necessary, Notice of Privacy Practices, Protected Health Information, Required By Law, Secretary, Security Incident, Subcontractor, Unsecured Protected Health Information, and Use.

Specific definitions:

(a) Business Associate.  "Business Associate" shall generally have the same meaning as the term "business associate" at 45 CFR 160.103, and in reference to the party to this Agreement, shall mean Paramount Pharmacy Group LLC.

(b) Covered Entity.  "Covered Entity" shall generally have the same meaning as the term "covered entity" at 45 CFR 160.103, and in reference to the party to this Agreement, shall mean Health Haven Corp.

(c) HIPAA Rules.  "HIPAA Rules" shall mean the Privacy, Security, Breach Notification, and Enforcement Rules at 45 CFR Part 160 and Part 164.

(d) The Management Services Agreement.  "The MSA" shall mean the Management Services Agreement between the Parties.

## Obligations and Activities of Business Associate

Business Associate agrees to:

(a) Not use or disclose protected health information other than as permitted or required by the MSA or as required by law;

(b) Use appropriate safeguards, and comply with Subpart C of 45 CFR Part 164 with respect to electronic protected health information, to prevent use or disclosure of protected health information other than as provided for by the MSA;

(c) Report to covered entity any use or disclosure of protected health information not provided for by the MSA of which it becomes aware, including breaches of unsecured protected health information as required at 45 CFR 164.410, and any security incident of which it becomes

①

aware;

(d) In accordance with 45 CFR 164.502(e)(1)(ii) and 164.308(b)(2), if applicable, ensure that any subcontractors that create, receive, maintain, or transmit protected health information on behalf of the business associate agree to the same restrictions, conditions, and requirements that apply to the business associate with respect to such information;

(e) Make available protected health information in a designated record set to the covered entity as necessary to satisfy covered entity's obligations under 45 CFR 164.524. Any request for access by the individual or the individual's designee shall be forwarded to the covered entity to fulfill;

(f) Make any amendment(s) to protected health information in a designated record set as directed or agreed to by the covered entity pursuant to 45 CFR 164.526, or take other measures as necessary to satisfy covered entity's obligations under 45 CFR 164.526. Any request for amendment by the individual or the individual's designee shall be forwarded to the Covered Entity to fulfill;

(g) Maintain and make available the information required to provide an accounting of disclosures to the Covered Entity as necessary to satisfy covered entity's obligations under 45 CFR 164.528. Any request for an accounting by the individual or the individual's designee shall be forwarded to the Covered Entity to fulfill;

(h)    To the extent the business associate is to carry out one or more of covered entity's obligation(s) under Subpart E of 45 CFR Part 164, comply with the requirements of Subpart E that apply to the covered entity in the performance of such obligation(s); and

(i) Make its internal practices, books, and records available to the Covered Entity for purposes of determining compliance with the HIPAA Rules.

**Permitted Uses and Disclosures by Business Associate**

(a) Business associate may only use or disclose protected health information as necessary to perform the services set forth in the MSA.

(b) Business associate may use or disclose protected health information as required by law.

(c) Business associate agrees to make uses and disclosures and requests for protected health information consistent with covered entity's minimum necessary policies and procedures.

(d) Business associate may not use or disclose protected health information in a manner that would violate Subpart E of 45 CFR Part 164 if done by covered entity except for the specific uses and disclosures set forth below and/or those which are found in the MSA.

(e) Business associate may use protected health information for the proper management and administration of the business associate or to carry out the legal responsibilities of the

②

business associate.

**Provisions for Covered Entity to Inform Business Associate of Privacy Practices and Restrictions**

(a) Covered entity shall notify business associate of any limitation(s) in the notice of privacy practices of covered entity under 45 CFR 164.520, to the extent that such limitation may affect business associate's use or disclosure of protected health information.

(b) Covered entity shall notify business associate of any changes in, or revocation of, the permission by an individual to use or disclose his or her protected health information, to the extent that such changes may affect business associate's use or disclosure of protected health information.

(c) Covered entity shall notify business associate of any restriction on the use or disclosure of protected health information that covered entity has agreed to or is required to abide by under 45 CFR 164.522, to the extent that such restriction may affect business associate's use or disclosure of protected health information.

**Permissible Requests by Covered Entity**

Covered entity shall not request business associate to use or disclose protected health information in any manner that would not be permissible under Subpart E of 45 CFR Part 164 if done by covered entity except the business associate will use or disclose protected health information pursuant to the MSA, and the legal responsibilities of the business associate.

**Term and Termination**

(a) <u>Term</u>. The Term of this Agreement shall run concurrently with the term of the MSA.

(b) <u>Termination for Cause</u>. Business Associate authorizes termination of this Agreement by covered entity only if Business Associate has violated a material term of the MSA and business associate has not cured the breach or ended the violation within the time specified by the MSA.

(c) <u>Obligations of Business Associate Upon Termination</u>.

Upon termination of this Agreement for any reason, business associate, with respect to protected health information received from covered entity, or created, maintained, or received by business associate on behalf of covered entity, shall:

1. Retain only that protected health information which is necessary for business associate to continue its proper management and administration or to carry out its legal responsibilities;

2. Return to covered entity or, if agreed to by covered entity, destroy the remaining

③

Paramount Pharmacy Group LLC v. Iqbal
Case No. 7:25-cv-04780-CS
Exhibit 4 - Page 14 of 23

protected health information that the business associate still maintains in any form;

3.  Continue to use appropriate safeguards and comply with Subpart C of 45 CFR Part 164 with respect to electronic protected health information to prevent use or disclosure of the protected health information, other than as provided for in this Section, for as long as business associate retains the protected health information;

4.  Not use or disclose the protected health information retained by business associate other than for the purposes for which such protected health information was retained and subject to the same conditions set out at paragraph (e) above under "Permitted Uses and Disclosures By Business Associate" which applied prior to termination; and

5.  Return to covered entity or, if agreed to by covered entity, destroy the protected health information retained by business associate when it is no longer needed by business associate for its proper management and administration or to carry out its legal responsibilities.

(d) Survival.   The obligations of business associate under this Section shall survive the termination of this Agreement.

**Miscellaneous**

(a) Regulatory References. A reference in this Agreement to a section in the HIPAA Rules means the section as in effect as of the effective date of this Agreement.

(b) Amendment. The Parties agree to take such action as is necessary to amend this Agreement from time to time as is necessary for compliance with the requirements of the HIPAA Rules and any other applicable law.

(b) Interpretation. Any ambiguity in this Agreement shall be interpreted to permit compliance with the HIPAA Rules.

PARAMOUNT PHARMACY GROUP LLC
The "**Business Associate**"


By: _____
Ibrar Nadeem, CEO on behalf of Paramount
Pharmacy Group LLC

HEALTH HAVEN CORP.
The "**Covered Entity**"


By: _____
Muhammad Assad Iqbal, President on behalf
of Health Haven Corp.

④

# EXHIBIT B

*[RIGHT OF FIRST REFUSAL AGREEMENT]*

_____ Service Provider

_____Company

Paramount Pharmacy Group LLC v. Iqbal
Case No. 7:25-cv-04780-CS
Exhibit 4 - Page 16 of 23

Right of First Refusal
January 31, 2025

**DEFINITIONS**

Capitalized terms used herein shall have the meanings set forth in this agreement.

**"Company"** means **Health Haven Corp.** (d/b/a Prescription Plus Pharmacy) with an address of 105 Croton Avenue, Ossining, New York 10562 and its successors, heirs, executors, administrators, legal representatives, and assigns.

**"Independent Third Party"** means any person or entity that is not a party to this agreement.

**"Interest"** means any amount of shares or interest or membership interest of the Company owned by Owner as well as any customer list(s) and customer information or accounts (including receivables).

**"Lien or Liens"** means any mortgage, pledge, security interest, option, encumbrance or other restriction or limitation of any nature whatsoever.

**"Offer-To-Purchase"** means a bona fide offer, submitted by an Independent Third Party, to purchase any Interest.

**"Owner"** means **Muhammad Assad Iqbal** shareholder of Company holding 100% interest or shares in the Company and his/her successors, heirs, executors, administrators, legal representatives, and assigns.

**"Paramount Pharmacy Group LLC"** means the limited liability company with an address of 377 Hoes Lane, Suite 105, Piscataway, New Jersey 08854 and its successors, heirs, executors, administrators, legal representatives, and assigns.

**"Transfer"** means to, directly or indirectly, sell, transfer, assign, pledge, encumber, hypothecate or similarly dispose of, either voluntarily or involuntarily, or to enter into any contract, option or other arrangement or understanding with respect to the sale, transfer, assignment, pledge, encumbrance, hypothecation or similar disposition of, any Interest.

**ARTICLE I**
**RIGHT OF FIRST REFUSAL**

(a)    **Consideration.** Owner acknowledges and agrees that Paramount Pharmacy Group LLC ("Paramount") has paid good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, for the option set forth herein.

(b)    **Contemplation/Offer-To-Purchase.** At any time (a) Owner contemplates a Transfer or (b) upon receipt of an Offer-To-Purchase, and subject to the terms and conditions specified in this Agreement, Paramount shall have the first right of refusal to purchase the Interest which Owner seeks to Transfer. Each time the Owner receives an Offer-To-Purchase, the Owner shall first make an offering to Paramount in accordance with the following provisions of this Article prior to consummating a Transfer to an Independent Third Party.

(c)    **Offer Notice.**

v. 09052024                                                                          1

**Right of First Refusal**
**January 31, 2025**

       (i)     The Owner shall, upon contemplation of a Transfer or within five business days of receipt of an Offer-To-Purchase, give written notice (the "Offering Notice") to Paramount stating that s/he received a bona fide offer from an Independent Third Party and specifying: (a) the Interest to be transferred; (b) the name of the person or entity who has offered to purchase the Interest; (c) the purchase price and other material terms and conditions of the sale, including a description of any non-cash consideration in sufficient detail to permit the valuation thereof; and (d) the proposed date, time and location of the closing of the sale, which shall not be less than sixty (60) days from the date of the Offering Notice.

       (ii)    The Offering Notice shall be irrevocable until the end of the Redeeming Notice Period.

       (iii)   By delivering the Offering Notice, the Owner represents and warrants to Paramount that: (a) the Owner has full right, title and interest in and to the Interest being transferred; (b) the Owner has all the necessary power and authority, and has taken all necessary action to transfer such Interest as contemplated by this Agreement; and (c) the Interest is/are free and clear of any and all Liens other than those arising as a result of or under the terms of this Agreement.

      (d)    **Exercise of Right of First Refusal.** Upon receipt of the Offering Notice, Paramount shall have twenty (20) business days (the "Redeeming Notice Period") to elect to purchase the Interest by delivering a written notice to the Owner (the "Redeeming Notice"), via email with return receipt or USPS certified mailing with return receipt, stating that it or its designee will purchase such Interest on the terms specified in the Offering Notice. Any Redeeming Notice shall be binding and irrevocable upon delivery.

      (e)    **Closing.** At the closing of any sale and purchase pursuant to this Agreement, the Owner shall deliver to Paramount the Interest to be transferred, accompanied by any and all necessary documentation and evidence of transfer.

      (f)    **Successors and Assigns.** The terms, rights, obligations, covenants and conditions herein contained shall be binding upon and inure to the benefit of the respective Parties and their successors, heirs, executors, administrators, legal representatives, and assigns.

      (g)    **Breach and Remedies.** In the event Owner breaches this Agreement and fails to abide by the agreed upon terms herein, Paramount shall be entitled to nullify and void any Transfer, and/or be declared to be the rightful owner of the Interest. The Parties acknowledge and agree that any Party would be damaged irreparably in the event any of the provisions of this Agreement are not performed in accordance with their specific terms or otherwise are breached. Accordingly, the Parties agree that any Party shall be entitled to an injunction or injunctions to prevent breaches of the provisions of this Agreement and to enforce specifically this Agreement and the terms and provisions hereof.

      (h)    **Attorneys Fees and Costs for Enforcement.** The Parties agree that in the event of a breach of this Agreement, the defaulting party shall be responsible for reimbursing the other party all attorneys fees and costs expended in conjunction with enforcing any term of this Agreement.

      (i)    **Governing Laws; Construction.** All matters relating to the interpretation, construction and enforcement of this Agreement shall be governed by the laws of the State of New

**Right of First Refusal**
**January 31, 2025**

Jersey. The terms of this Agreement are not to be construed against any one Party but are to be construed as if both Parties prepared it equally.

(j)      **Invalidity.** In the event that any one or more of the terms or provisions contained in this Agreement, for any reason, are held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement, and such invalid, illegal or unenforceable provision shall be interpreted so as to give the maximum effect of such term or provision allowable by law.

(k)      **Survival.** The provisions of this Right of First Refusal shall survive the termination of the Management Services Agreement.

(l)      **Legal Consultation.** The Parties represent that they have read and understand this Agreement, and that the meaning and effect of this Agreement have been fully explained to them by their attorneys.

IN WITNESS WHEREOF, the Parties hereto have caused this Right of First Refusal to be executed as of the day and year written below.

OWNER

By: _____

Muhammad Assad Iqbal individually and as President on behalf of Health Haven Corp.

State of New Jersey      }
                         : ss.
County of Morris         }

Subscribed to and sworn before me by, Muhammad Awad Iqbal, this 4th day of February 2025.

_____
Notary Public

(seal)   **JEFFREY HELDMAN**
         **ATTORNEY AT LAW**
         **STATE OF NEW JERSEY**
         #013307012      *[ADDITIONAL SIGNATURE PAGE TO FOLLOW*]

Paramount Pharmacy Group LLC v. Iqbal
Case No. 7:25-cv-04780-CS
Exhibit 4 - Page 19 of 23

**Right of First Refusal**
**January 31, 2025**

PARAMOUNT PHARMACY GROUP LLC



By: Ibrar Nadeem, CEO on behalf of Paramount Pharmacy Group LLC

State of New Jersey                     }
                                        : ss.
County of ___UNION___                   }

    Subscribed to and sworn before me by, __IBRAR AHMED__ , this _2_ day of _April_ 202_5_

_____
Notary Public
(seal)

Michael D Sheahan
NOTARY PUBLIC
State of New Jersey
ID # 50008106
My Commission Expires 01/12/2030

Paramount Pharmacy Group LLC v. Iqbal
Case No. 7:25-cv-04780-CS
Exhibit 4 - Page 20 of 23

Page 4 of 4

# **EXHIBIT C**

*[POWER OF ATTORNEY]*

_____ Service Provider

_____ Company

Page 13 of 13

# POWER OF ATTORNEY

This Power of Attorney is made on *02-04*, 20 *25*

**Between**:

The Principal, **Health Haven Corp. (d/b/a Prescription Plus Pharmacy) and its authorized shareholders**, whose address is 105 Croton Avenue, Ossining, New York 10562, referred to as "Principal",

**And**:

The Agent, **Paramount Pharmacy Group LLC and its authorized officers, employees and agents**, whose address is 377 Hoes Lane, Suite 105, Piscataway, New Jersey 08854, referred to as "Agent".

1.    **Grant of Authority**.  Principal appoints Agent to act as its Agent (called an attorney in fact) to do each and every act which Principal could personally do for the following uses and purposes: to do all acts that Principal might or could have done in the normal course of business.

2.    **Powers**.  Principal gives Agent all the power and authority which Principal may legally give to Agent. Principal may revoke this Power of Attorney or appoint a new Agent in its place. Principal approves and confirms all that Agent or its substitute may lawfully do on Principal's behalf, including but not limited to the following:

a.    Contracting: to execute legally binding contracts and agreements and to bind the Principal; to open or close wholesaler accounts; to negotiate drug prices; to negotiate non-pharmaceutical prices; to negotiate and enter into leases; to negotiate and enter into PBM contracts and negotiate pharmaceutical pricing as part of a collective;

b.    Banking: to have unrestricted access to any banking or financial account; to open or close any banking or financial account; to be added as signatory on any banking or financial account; to issue payments on behalf of the Principal; to collect and receive all proceeds from business operations;

c.    Retention of Professionals: to hire and terminate any professional, including counsel and accountants, and pursue or defend any legal claims;

d.    Meetings: to conduct, commence and attend any meeting; to attend seminars; to attend conferences; to represent Principal in business to business transactions;

e.    To represent Principal in all respects of business operations including, but not limited to, negotiation, payment and settlement of any claim.

v. 10142024                                        1

Paramount Pharmacy Group LLC v. Iqbal
Case No. 7:25-cv-04780-CS
Exhibit 4 - Page 22 of 23

**3.**    **Disability.**  This Power of Attorney is effective now and remains in effect even if Principal or its authorized shareholders become disabled or incapacitated at some future date.

**4.**    **Indemnification.** The Parties refer to and incorporate by reference, as if stated at full length herein, Paragraph 10 of the Management Services Agreement (a/k/a the Exculpation and Indemnification clause).

**5.**    **Signatures**.  By signing below, Principal acknowledges that it has received a copy of this Power of Attorney and that it understands and agrees to its terms.

<u>**Acknowledgment by Agent**</u>
The undersigned acknowledges the within grant of power of attorney and agrees to act pursuant to its terms.

By: _____
Ibrar Nadeem, CEO on behalf of
Paramount Pharmacy Group LLC

**BY PRINCIPAL:**

_____
Muhammad Assad Iqbal, President on behalf of Health Haven Corp. (d/b/a Prescription Plus Pharmacy)

STATE OF NEW Jersey,
                                        SS:
COUNTY OF Morris

On this 4th day of February 2025, before me, the subscriber, personally appeared Muhammad Assad Iqbal who, I am satisfied is the President (or other officer/manager/agent) of the corporation named herein and who by me duly sworn/affirmed, asserted authority to act on behalf of the corporation and who, by virtue of its Bylaws, or Resolution of its Board of Directors (or operating agreement) executed the within instrument on its behalf, and thereupon acknowledged that it was signed, sealed and delivered as Health Haven Corp.'s act and deed, for the purposes herein expressed.

_____
NOTARY PUBLIC
(SEAL)        JEFFREY HELDMAN
              ATTORNEY AT LAW
              STATE OF NEW JERSEY
              #01330201

v. 10142024                                        2