# STOCK PURCHASE AGREEMENT

between

**MUHAMMAD ASSAD IQBAL**

and

**MELISSA DOBSON**

Doc ID: 05cd6a8d4b8f0f2e941c98307c633ec978adec37

**TABLE OF CONTENTS**

ARTICLE I PURCHASE AND SALE ........ 3

ARTICLE II REPRESENTATIONS AND WARRANTIES OF SELLER ........ 4

ARTICLE III REPRESENTATIONS AND WARRANTIES OF BUYER ........ 9

ARTICLE IV CONDITIONS PRECEDENT TO CLOSING ........ 10

ARTICLE V CLOSING ........ 10

ARTICLE VI PATIENT RECORDS, LICENSES, PERMITS AND NUMBERS ........ 12

ARTICLE VII COVENANTS ........ 13

ARTICLE VIII RESTRICTIVE COVENANTS ........ 15

ARTICLE IX INDEMNIFICATION ........ 16

ARTICLE X TAX MATTERS ........ 17

ARTICLE XI MISCELLANEOUS ........ 18

# STOCK PURCHASE AGREEMENT

This Stock Purchase Agreement (this "Agreement") is entered into between **MELISSA DOBSON**, an individual with an address of [redacted] ("Seller") and **MUHAMMAD ASSAD IQBAL**, an individual with an address of **2 Stubbe Drive, Stony Point, NY 10980** ("Buyer"). The "Effective Date" of this Agreement shall mean the latest date upon which the last Seller or Buyer signs this Agreement as set forth under their signatures at the end of this Agreement.

## RECITALS

WHEREAS, Seller owns 100% of the issued and outstanding shares of common stock (the "Shares"), of **HEALTH HAVEN CORP.**, a New York corporation (the "Company"); and

WHEREAS, the Company is presently the owner and operator of a certain retail pharmacy (the "Business") known as **Prescription Plus Pharmacy** (the "Trade Name") located at **105 Croton Ave., Ossining, NY 10562** (the "Premises"); and

WHEREAS, Seller wishes to sell to Buyer, and Buyer wishes to purchase from Seller, the Shares of the Company, subject to the terms and conditions set forth herein;

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I
### PURCHASE AND SALE

**Section 1.01 Purchase and Sale**. Subject to the terms and conditions set forth herein, Seller shall sell to Buyer, and Buyer shall purchase from Seller, the Shares, as is free and clear of any mortgage, pledge, lien, charge, security interest, claim or other encumbrance (collectively the "Encumbrances").

**Section 1.02 Purchase Price**. As consideration for the purchase of the Shares, the Buyer agrees to assume the following liabilities:

(a) Any and all liability for the June 25, 2024 promissory note issued by Richard Sperrezza to Melissa Dobson in the principal amount of Two Hundred Thousand Dollars ($200,000.00) (the "Promissory Note"); and

(b) Any and all debts, liabilities, and obligations of the Company (the "Assumed Liabilities")

**Section 1.03    Inventory**. There shall be no adjustments at Closing for any the inventory of the Company.

**Section 1.04    Accounts Receivable**. There shall be no adjustments at Closing for any accounts receivable of the Company.

**Section 1.05    Wholesale Accounts**. Buyer shall be permitted to order inventory on Seller's existing accounts with the Wholesalers ("Seller' Wholesale Accounts") for a period of no longer than sixty (60) days following the Closing ("Wholesale Account Transfer Period").  Before the end of the Wholesale Account Transfer Period, Buyer shall open its own independent trade accounts with the Wholesalers ("Buyer's Wholesale Accounts") and shall thereafter only order inventory from Wholesalers on the Buyer's Wholesale Accounts. Buyer shall responsible for all costs, expenses, and fees associated with Seller's wholesale account as of Closing.


## ARTICLE II
### REPRESENTATIONS AND WARRANTIES OF SELLER

As an inducement to Buyer to enter into this Agreement, the Seller, individually and on behalf of the Company, make the following representations and warranties, to the best of their knowledge, all of which shall be true and accurate as of the date of this Agreement and the date of Closing:

**Section 2.01    Authority of Seller**. Seller is an individual with full power and authority to enter into this Agreement, to carry out its obligations hereunder and to consummate the transactions contemplated hereby. This Agreement constitutes a legal, valid, and binding obligation of Seller enforceable against Seller in accordance with its terms.

**Section 2.02    Non-foreign Status**. Seller is not a "foreign person" as that term is used in Treasury Regulation Section 1.1445-2.

**Section 2.03    Organization, Authority, and Qualification of the Company**. The Company is a corporation duly organized, validly existing and in good standing under the Laws of the State of New York and has full corporate power and authority to carry on its business as it has been and is currently conducted.

**Section 2.04    Capitalization**.

(a)    Although two-hundred (200) shares of common stock are authorized under the Company's certificate of incorporation, only one-hundred (100) shares of

common stock are issued and outstanding. There are no preferred shares or other shares issued or outstanding as of Closing.

(b)     All of the common stock of the Company is owned by the Seller. All of the Shares have been duly authorized, are validly issued, fully paid, and non-assessable, and are owned of record and beneficially by Seller, free and clear of all Encumbrances. Upon consummation of the transactions contemplated by this Agreement, Buyer shall own all of the Shares, free and clear of all Encumbrances.

(c)     All of the Shares were issued in compliance with applicable statutes, laws, ordinances, regulations, rules, codes, orders, treaties, decrees, or other requirements of any governmental authority (collectively referred to as "Laws"). None of the Shares were issued in violation of any agreement, arrangement, or commitment to which Seller or the Company is a party or is subject to or in violation of any preemptive or similar rights of any individual, business entity, governmental entity, or trust (collectively referred to as a "Person").

(d)     There are no outstanding or authorized options, warrants, convertible securities, or other rights, agreements, arrangements, or commitments of any character relating to the capital stock of the Company or obligating Seller or the Company to issue or sell any shares of capital stock of, or any other interest in, the Company. The Company does not have outstanding or authorized any stock appreciation, phantom stock, profit participation, or similar rights. There are no voting trusts, stockholder agreements, proxies, or other agreements or understandings in effect with respect to the voting or transfer of any of the Shares.

**Section 2.05    No Subsidiaries**. The Company does not own or have any interest in any shares or have an ownership interest in any other Person.

**Section 2.06    No Conflicts; Consents**. The execution, delivery, and performance by Seller of this Agreement, and the consummation of the transactions contemplated hereby, do not and will not: (a) conflict with or result in a violation or breach of, or default under, any provision of the certificate of incorporation, by-laws, or other organizational documents of the Company; (b) conflict with or result in a violation or breach of any provision of any Law applicable to Seller or the Company; (c) require the consent, notice, or other action by any Person under, conflict with, result in a violation or breach of, constitute a default or an event that, with or without notice or lapse of time or both, would constitute a default under, result in the acceleration of or create in any party the right to accelerate, terminate, modify, or cancel any Contract to which Seller or the Company is a party or by which Seller or the Company is bound or to which any of their respective properties and assets are subject; or (d) result in the creation or imposition of any Encumbrances.

**Section 2.07 Legal Proceedings; Governmental Orders, Audits.** The foregoing representations of Seller relate only to the Seller's period of ownership of the Company. Seller makes no representations as to the time period prior to Seller's ownership:

(a) There is no claim, action, cause of action, demand, lawsuit, arbitration, inquiry, audit, notice of violation, proceeding, litigation, citation, summons, subpoena, or investigation of any nature, civil, criminal, administrative, regulatory or otherwise, whether at law or in equity (collectively referred to as "Actions") pending or, to Seller's knowledge, threatened (a) against or by the Company affecting any of its properties or assets; or (b) against or by the Company or Seller that challenges or seeks to prevent, enjoin or otherwise delay the transactions contemplated by this Agreement. No event has occurred or circumstances exist that may give rise to, or serve as a basis for, any such Action.

(b) There are no outstanding governmental orders and no unsatisfied judgments, penalties or awards against or affecting the Company or any of its properties or assets.

(c) Neither Seller, nor any business entity with which they are or in the last five years have been affiliated, have ever been subject to any administrative action, suit, or proceeding by the Board of Pharmacy, Department of Health or Department of Consumer Affairs, or the DEA, or by any other federal or state agency responsible for administration of healthcare or pharmacy-related services. Seller has never been excluded from participation or denied enrollment in any federal or state program related to provision of, or payment for, pharmacy-related services, nor have his privileges with such programs ever been suspended. No health plan, pharmacy benefit manager, third-party administrator, wholesaler, or governmental payer has ever suspended, revoked, terminated or not renewed its agreement for cause with any entity in which the Seller is or has been a shareholder, member, partner, supervising pharmacist, officer, or director.

(d) There are no pending audits against the Company by CVS/Caremark, Express Scripts, United Healthcare/Optum Rx, Elixir, or any other PBM, or other third-party payor or insurance company, with which the Company does business, nor was the Company denied enrollment with any PBM to which it applied. The Company is currently enrolled with at least the following PBMs: CVS/Caremark, Optum Rx, Express Scripts, Humana, Elixir.

**Section 2.08 Compliance With Laws; Licenses**.

(a) The Company has complied, and is now complying, with all Laws applicable to it or its business, properties or assets.

(b) All licenses required for the Company to conduct its business have been obtained by it and are valid and in full force and effect. All fees and charges with respect to such Permits as of the date hereof have been paid in full.

(c)    The Company is currently registered with the New York State Board of Pharmacy and the United States Drug Enforcement Administration. There are no criminal, administrative, or disciplinary proceedings or investigations pending or threatened against the Company or Seller. No current corporate officer, director, or shareholder of the Company, specifically Seller, has in the past had any license necessary to the conduct of the business, suspended, or revoked or otherwise sanctioned, nor has the Company ever been excluded, terminated, or otherwise sanctioned by any state or federal health care program under Seller.

**Section 2.09    No Loans by/to Seller**. Seller has not made any loans to the Company. The Company has not made any loans to the Seller.

**Section 2.10    No Claims by Seller**. Seller does not have any claims against the Company of any nature whatsoever, including but not limited to, any claims arising from unpaid wages, accrued vacation pay, bonuses, loans made to the Company, dividends, it being expressly understood that Seller shall forever waive any further claims against the Company arising from their equity interest in the Company or employment by the Company prior to the date of Closing.

**Section 2.11    Undisclosed Liabilities**. The Company has no liabilities, obligations, or commitments of any nature whatsoever, asserted or unasserted, known, absolute or contingent, accrued or unaccrued, matured or unmatured, or otherwise, except those which have been incurred in the ordinary course of business consistent with past practice and which are not, individually or in the aggregate, immaterial in amount.

**Section 2.12    Insurance**. Seller has maintained since her acquisition of the Company and the Company shall have at the Closing, fire, theft, casualty, liability, and other insurance policies in commercially reasonable amounts of coverage, with reasonable deductibles, insuring the Company and its properties and operations. All such insurance policies are in full force and effect and will continue in full force and effect up to and including the Closing. To Seller's knowledge, the Company has not committed any act or failed to take any action which could entitle the carrier of any such insurance policy to avoid coverage there under or to increase the premium payable there under.

**Section 2.13    Employment Agreements**. The Company does not have any written employment agreements or any other agreements with any of its employees or members and all employees of the Company are "at will" employees and may be terminated by the Company without prior notice.

**Section 2.14    Benefit Plans**. There are no pension, retirement, profit sharing, Section 401(k), thrift-savings, individual retirement account, excess benefit plan, deferred compensation, incentive compensation, stock bonus, stock option, restricted

stock, cash bonus, employee stock ownership (including, without limitation, payroll related employee stock ownership), severance pay, cafeteria, flexible compensation, life insurance, medical, dental, disability, welfare, or vacation plans or arrangements of any kind and any other Employee Pension Benefit Plan or Employee Welfare Benefit Plan (as defined in Section 3 of ERISA), incentive compensation plan or fringe benefit or any combination of the foregoing established, maintained, sponsored, contributed to, or otherwise participated in by the Company for any of the employees or past employees of the Company at any time prior to the Closing.

**Section 2.15 Defaults**. To the best of Seller's knowledge, the Company is not in default with respect to any judgment, order, writ, injunction, or decree of any court of federal, state, municipal, or other governmental department, commission, board, bureau, agency or instrumentality. To the best of Seller's knowledge, the Company is not in default under any contracts or agreements, and to the best of Seller's knowledge, there exists no state of facts that might result in a default under any agreements or contracts to which the Company is a party.

**Section 2.16 Prescription Records**. The Company has maintained the prescription records for such period of time as is required by law or by Medicare or Medicaid but in no event less than five (5) years. The Company is in compliance with the requirements of the 2013 Drug Supply Chain and Security Act ("DSCSA"), and has maintained, for the period prescribed under DSCSA, all documents and records that are required to be maintained thereunder, including transaction information, transaction history, and transaction statements for each drug purchased by the Company. Neither the Company nor the Seller have copied, retained or transferred, and will not copy, retain, or transfer the Company's prescription and customer files and records to any other person, pharmacy, or other entity, nor have they otherwise solicited or diverted the customers and clients of the Company to any other person, pharmacy, or other entity. Seller shall not copy or transfer any customer files or prescription records contained in databases or software utilized by the Company in the conduct of its business.

**Section 2.17 Merchandise Inventory**. The Company has purchased all merchandise inventory, including all prescription inventory, including all prescription and over-the-counter inventory, in the ordinary course of business and only from a VAWD-accredited wholesaler duly licensed and authorized to do business in New Jersey and such purchases by the Company complied with all applicable provisions of applicable law including the Federal Food, Drug and Cosmetic Act, as amended and with all rules, regulations, or requirements of the various PBMs and other insurance companies with whom the Company is enrolled, including but not limited to CVS Caremark, OptumRx, Express-Scripts, and the like, and in the event of audit, all of the Company purchases would be found to be from acceptable sources. The prescription drugs inventory does not consist of any private label items.

   **Section 2.18 Brokers**. No broker, finder, or investment banker is entitled to any brokerage, finder's, or other fee or commission in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of Seller.

## ARTICLE III
### REPRESENTATIONS AND WARRANTIES OF BUYER

As an inducement to Seller to enter into this Agreement, the Buyer makes the following representations and warranties, to the best of their knowledge, all of which shall be true and accurate as of the date of this Agreement and the date of Closing:

**Section 3.01 Organization and Authority of Buyer**. Buyer is an individual with full authority to enter into this Agreement, to carry out its obligations hereunder and to consummate the transactions contemplated hereby. This Agreement constitutes a legal, valid, and binding obligation of Buyer enforceable against Buyer in accordance with its terms.

**Section 3.02 No Conflicts; Consents**. The execution, delivery, and performance by Buyer of this Agreement, and the consummation of the transactions contemplated hereby, do not and will not: (a) conflict with or result in a violation or breach of any provision of any Law applicable to Buyer; or (b) require the consent, notice, or other action by any Person under any contract to which Buyer is a party. No consent, approval, or notice to, any governmental authority is required by or with respect to Buyer in connection with the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby.

**Section 3.03 Purpose**. Buyer is acquiring the Shares solely for its own account and not with a view to, or for offer or sale in connection with, any distribution thereof. Buyer acknowledges that the Shares are not registered under the Securities Act of 1933, as amended, or any state securities laws, and that the Shares may not be transferred or sold except pursuant to the registration provisions of the Securities Act of 1933, as amended or pursuant to an applicable exemption therefrom and subject to state securities laws and regulations, as applicable.

**Section 3.04 Brokers**. No broker, finder, or investment banker is entitled to any brokerage, finder's, or other fee or commission in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of Buyer.

**Section 3.05 Legal Proceedings**. There are no Actions pending or, to Buyer's knowledge, threatened against or by Buyer that challenge or seek to prevent, enjoin, or

otherwise delay the transactions contemplated by this Agreement. No event has occurred, or circumstances exist that may give rise or serve as a basis for any such Action.

## ARTICLE IV
### CONDITIONS PRECEDENT TO CLOSING

**Section 4.01   Books and Records**.   From the date of the execution of this Agreement until Closing, the Buyer may inspect all books and records of the Seller relating to the Business, including but not limited to, financial records, personnel records, files, and manuals.

**Section 4.02   Conditions Precedent to Closing**.  The Closing of the transactions contemplated herein shall be contingent upon the following:

(a)     All representations and warranties of Seller and Buyer shall be true and correct on and as of the date of Closing;

(b)     The Company shall not have received any notice that its Board of Pharmacy registration number, DEA number, Medicaid Provider number, or Medicare number will be suspended or revoked, or receives notice of agency action or like notice from any agency having jurisdiction over the pharmacy, which action might result in the suspension or revocation of those numbers, or that any third party payor, including any PBM, will be terminating, suspending or revoking the Company's participation, or the Seller or Company receive notice of an audit to be commenced by any third party payor, PBM or insurance company; and

(c)     Seller and Buyer shall concurrently with this Agreement executed documents necessary for the new owner of the Premises to assume the personal guaranty of the lease for the Premises and for the landlord's consent to the new ownership of the Company with any costs to obtain such approval paid by the Seller.

## ARTICLE V
### CLOSING

**Section 5.01   Closing**. Subject to the terms and conditions of this Agreement, the consummation of the transactions contemplated by this Agreement shall take place within ten (10) days after the execution of this Agreement (the "Closing"). The location shall be at the office of Buyer's counsel unless otherwise agreed upon by the Parties. Seller shall have the ability to close remotely.

**Section 5.02   Closing Deliverables**.

(a)     At the Closing, Seller shall deliver to Buyer the following:

(i)     an assignment and assumption agreement with regard to the Promissory Note;

(ii)    stock certificates evidencing the Shares, free and clear of all Encumbrances, duly endorsed or accompanied by stock powers or other instruments of transfer duly executed;

(iii)   if applicable, a certification of lost stock certificate;

(iv)    Seller's closing certificate in a form to be approved by Buyer confirming that the representations and warranties of the Seller contained in this Agreement are true and correct as of the Closing;

(v)     Resolution authorizing and ratifying the transaction contemplated hereunder;

(vi)    Banking resolution or whatever documents are required by the Company's banking institution to have the Buyer be an authorized signatory on the Company's bank account;

(vii)   Resignation(s) as director(s), officer(s), and/or employee(s) of the Company, as applicable;

(viii)  General power of attorney authorizing the Buyer to operate and conduct the business of the Company  for such reasonable period of time as it shall take for Buyer to obtain all new registration and provider numbers in their own name;

(ix)    Power of attorney to be submitted to the DEA authorizing the replacement of Seller as the responsible party;

(x)     Letter to the NCPDP regarding the change in ownership of the Company;

(xi)    CVS/Caremark transfer of ownership notification form;

(xii)   all company books and records of the Company;

(xiii)  keys and alarm codes for the Company;

(xiv)   all passwords, authorization, and other permission to transfer right, title, and interest in the Company's website(s) and social media accounts;

(xv)    such other customary instruments of transfer, assumption, filings, or documents, in form and substance reasonably satisfactory to Buyer, as may be required to give effect to this Agreement; and

(xvi)   if there are any usernames and/or passwords for Company accounts that the Buyer doesn't have Seller agrees to provide same to Buyer or work with Buyer to authenticate and get new

usernames and/or passwords set up. This provision (a)(xvi) shall survive Closing.

(b) At the Closing, Buyer shall deliver to Seller the following:

(i) an assignment and assumption agreement with regard to the Promissory Note; and

(ii) such other customary instruments of transfer, assumption, filings or documents, in form and substance reasonably satisfactory to Buyer, as may be required to give effect to this Agreement.

**Section 5.03 Bank Accounts**. Immediately upon the Closing, Buyer shall be added as a signatory on the Company's bank account(s), with full authority to view and transact business. Simultaneously, Seller shall be removed as a signatory from the Company's bank account(s).

## ARTICLE VI
### PATIENT RECORDS, LICENSES, PERMITS AND NUMBERS

**Section 6.01 Patient Records**. The Buyer agrees to have the Company maintain all of the Patient Records in accordance with all applicable State and Federal laws, including, without limitation, the requirements imposed by the New Jersey State Board of Pharmacy and the privacy and security regulations adopted pursuant to the federal Health Insurance Portability and Accountability Act of 1996 (the "HIPAA Privacy and Security Rules"). The Buyer shall cause the Company to maintain originals of all such patient records as required by law, including but not limited to, all prescriptions, signature logs, and invoices ("Patient Records"), and for a period of time equal to the applicable statute of limitations plus two years but in any event for a period of no less than ten (10) years. The Seller shall have access to all such Patient Records for the purpose of defending any claim, threatened claim, action, investigation, or any other matter as reasonably necessary.

**Section 6.02 Licenses, Permits, and Numbers**. The Company has various permits and licenses used and/or required to be used in the business, including, without limitation, a New York Pharmacy Permit, New York Medicaid fee for service provider number, federal Drug Enforcement Administration ("DEA") license, Controlled Dangerous Substance registration ("CDS"), and all other existing licenses and certifications required for the Seller to dispense prescriptions in the state of New Jersey, and the Seller's National Provider Identifier ("NPI"), the National Council for Prescription Drug Programs ("NCPDP") numbers, and all rights to contracts with private payors (including, without limitation, any payors that have contracted with any governmental agency as well as any pharmacy benefit management ("PBM" plans)) and any licenses, registrations and approvals and limited contractual rights of any nature or description to sell durable medical equipment ("DME") (collectively, the "Company's Permits and

Numbers"). It is agreed by and among the Company, Buyer, and Seller that they shall cooperate in executing any documents required by any entity related to the Company's Permits and Numbers to reflect the change in ownership of the Company including, but not limited to, the documents referenced in Section 5.02 above. Buyer will file all such forms, applications, and/or notices as soon as reasonably practicable after the Closing.

**Section 6.03 Other Notifications**. In addition, it is agreed by and among the Company, Buyer and Seller that they shall cooperate in executing any documents required by any vendors, wholesalers, Caremark, Express Scripts and Optum Rx and any other pharmacy benefit managers or other entities. Buyer will file all such forms, applications and/or notices as soon as reasonably practicable but in no event later than thirty (30) days after the Closing and provide proof of submission to Seller.

**Section 6.04 Further Assurances**. The Parties shall deliver or cause to be delivered such other documents and instruments as may reasonably be requested by other Party or be required under any relevant rules or regulations of any administrative agencies governing the operation and affairs of a retail pharmacy in the State of New Jersey.

## ARTICLE VII
## COVENANTS

**Section 7.01 Conduct of Business Prior to the Closing**. From the date hereof until the Closing, except as otherwise provided in this Agreement or consented to in writing by Buyer, Seller shall, and shall cause the Company to conduct the business of the Company in the ordinary course of business consistent with past practice, and use reasonable best efforts to maintain and preserve intact the goodwill and relationships of its employees, customers, lenders, suppliers, regulators, and others having business relationships with the Company. Without limiting the foregoing, from the date hereof until the Closing, Seller shall:

(a) cause the Company to preserve and maintain all licenses, certifications and/or permits related to the business of the Company;

(b) cause the Company to pay its debts, taxes, and other obligations when due;

(c) cause the Company to maintain the assets owned, operated or used by the Company in the same condition as they were on the date of this Agreement, subject to reasonable wear and tear;

(d) cause the Company to continue in full force and effect without modification all Insurance Policies;

(e)      cause the Company to maintain its books and records in accordance with past practice;

(f)      cause the Company to comply in all material respects with all applicable Laws;

(g)      not incur any obligation or liability, absolute, accrued, contingent, or otherwise, whether due or to become due, except liabilities in the ordinary course of business;

(h)      not mortgage, pledge, or subject any of its assets to any lien, charge or other encumbrance;

(i)      not sell, transfer, or otherwise dispose of any assets, except for sales made in the ordinary course of business;

(j)      not increase the compensation of or issue any bonus to any officer, director, employee, or agent; and

(k)      cause the Company not to take or permit any action that would cause any of the changes, events or conditions described in this section to occur.

**Section 7.02    No Solicitation of Other Bids**.

(a)      Seller and the Company shall not, directly or indirectly, (i) encourage, solicit, initiate, facilitate, or continue inquiries regarding an Acquisition Proposal; (ii) enter into discussions or negotiations with, or provide any information to, any Person concerning a possible Acquisition Proposal; or (iii) enter into any agreements or other instruments (whether or not binding) regarding an Acquisition Proposal. Seller and the Company shall immediately cease and cause to be terminated, all existing discussions or negotiations with any Persons conducted heretofore with respect to, or that could lead to, an Acquisition Proposal. For purposes hereof, "Acquisition Proposal" shall mean any inquiry, proposal, or offer from any Person (other than Buyer) concerning (i) a merger, consolidation, liquidation, recapitalization, share exchange, or other business combination transaction involving the Company; (ii) the issuance or acquisition of shares of capital stock or other equity securities of the Company; or (iii) the sale, lease, exchange, or other disposition of any significant portion of the Company's properties or assets.

(b)      Seller agrees that the rights and remedies for noncompliance with this section shall include having such provision specifically enforced by any court having equity jurisdiction, it being acknowledged and agreed that any such breach or threatened breach shall cause irreparable injury to Buyer and that money damages would not provide an adequate remedy to Buyer.

**Section 7.03    Notice of Certain Events**.

(a) From the date hereof until the Closing, Seller shall promptly notify Buyer in writing of:

(i) any fact, circumstance, event or action the existence, occurrence or taking of which (A) has had, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, or (B) has resulted in, or could reasonably be expected to result in, any representation or warranty made by Seller hereunder not being true and correct;

(ii) any notice or other communication from any Person alleging that the consent of such Person is or may be required in connection with the transactions contemplated by this Agreement;

(iii) any notice or other communication from any governmental authority in connection with the transactions contemplated by this Agreement; and

(iv) any Actions commenced or threatened against Seller or the Company.

**Section 7.04 Further Assurances**. Following the Closing, each of the parties hereto shall execute and deliver such additional documents, instruments, conveyances and assurances and take such further actions as may be reasonably required to carry out the provisions hereof and give effect to the transactions contemplated by this Agreement.

## ARTICLE VIII
### RESTRICTIVE COVENANTS

**Section 8.01 Seller's Covenant of Non-Competition**. Seller hereby covenants that for a period of two (2) years from the date of Closing they will not re-establish, re-open, become engaged, employed, or in any other manner whatsoever hold any financial interest, directly or indirectly, in the pharmacy business (including but not limited to a retail pharmacy, provision of pharmacy services to any nursing homes or any other facility of any nature or description, or to individuals) within **five (5)** miles from the Premises.

**Section 8.02 Seller's Covenant of Non-Solicitation**. The Seller hereby covenants they will not from the date of the Closing and for a period of two (2) years thereafter interfere with, disrupt or attempt to disrupt the relationship between the Company and any person or entity which on the date hereof or at the Closing is a customer, employee, or agent of the Company, including specifically contacting an employee of the Company to induce or encourage such employee to leave his or her employment with the Company or to breach his or her employment obligations to the

Company. Moreover, the Seller shall not hire any person who was an employee of the Company or is an employee of the Company.

**Section 8.03 Blue Pencil**. If a court of competent jurisdiction should deem any of the above restrictions to be unreasonable or unenforceable, then the Parties agree to submit to any reduction or modification of such restrictions as the court shall deem reasonable.

**Section 8.04 Injunctive Relief**. Each of the Parties acknowledges that money damages alone may not adequately compensate the other Party in the event that the breaching party or any of its principals breaches or threatens a breach of any of the above restrictions. Therefore, in addition to all remedies available to the non-breaching party at law or in equity, the non-breaching shall be entitled to interim restraints and permanent injunctive relief for the enforcement of the restrictions.

## ARTICLE IX
### INDEMNIFICATION

**Section 9.01 Survival**. All representations, warranties, covenants, and agreements contained herein and all related rights to indemnification shall survive the Closing.

**Section 9.02 Indemnification By Seller**. Seller shall defend, indemnify and hold Buyer harmless from and against all claims, judgments, damages, liabilities, settlements, losses, costs, and expenses, including attorneys' fees and disbursements, arising from or relating to:

(a) the claims of Seller's personal creditors un-related to debt of the Company;

(b) any fines, penalties, or losses of any description in connection with any audits, investigations, or inquiries conducted by third party payors, the New York Board of Pharmacy, Medicare, Medicaid, or any other governmental agency for any deficiencies or discrepancies in the Business or violation of law or regulation that occur prior to the date of Closing and during Seller's period of ownership of the Business;

(c) any claim related to any prescriptions delivered or services performed during Seller's period of ownership of the Business;

(d) any claim related to a breach of this Agreement by the Seller;

(e) any claims arising from any misrepresentation of the Seller; and

(f) any claims for brokerage commissions, finder's fees, or similar compensation in connection with the transactions contemplated in this Agreement based upon any arrangement, actions or agreement by or on behalf of Seller.

**Section 9.03 Indemnification By Buyer**. Buyer shall defend, indemnify and hold Seller harmless from and against all claims, judgments, damages, liabilities, settlements, losses, costs, and expenses, including attorneys' fees and disbursements, arising from or relating to:

(a) any claims against Seller pursuant to the Promissory Note;

(b) any claims of Buyer's creditors or the Company's creditors;

(c) any claims arising from, the Buyer's use of the Company's Permits and Numbers, including any fines, penalties or losses of any description in connection with any audits, investigations, or inquiries conducted by third party payors, the New York Board of Pharmacy, Medicare, Medicaid, or any other governmental agency of any nature or description for any deficiencies or discrepancies or violation of law or regulation that occur from or after the Closing;

(d) any claim related to a breach of this Agreement by the Buyer;

(e) any claims arising from any misrepresentation of the Buyer; and

(f) any claims for brokerage commissions, finder's fees, or similar compensation in connection with the transactions contemplated in this Agreement based upon any arrangement, actions or agreement by or on behalf of Buyer.

**Section 9.04 Attorney Fees**. Whether or not specified in any particular indemnification provision set forth herein, any indemnification required under this Section or otherwise in this Agreement shall include indemnification for reasonable attorney's fees and other legal expenses of the indemnified party.

**Section 9.05 Cumulative Remedies**. The rights and remedies provided in this Agreement are cumulative and are in addition to and not in substitution for any other rights and remedies available at law or in equity or otherwise.

## ARTICLE X
## TAX MATTERS

**Section 10.01 Tax Matters**. The parties understand that there may be corporate, sales, and other tax returns due and taxes to be paid by the Company during the tax year that includes the date of sale. In that regard the parties agree that they will have their respective accountants consult with one another to assure that all tax returns are filed, all taxes paid and the taxes due allocated between them with the Sellers responsible for any unpaid taxes due for the period prior to closing and the Buyer responsible for any taxes due for the period after closing. The costs of completing any

returns for the tax year in which the sale occurs shall be shared by Sellers and Buyer and apportioned based upon the period of time that Seller has owned the Company during the current tax year.

## ARTICLE XI
### MISCELLANEOUS

**Section 11.01 Expenses**. All costs and expenses incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the party incurring such costs and expenses including but not limited to each party's own attorney's fees incurred in connection with this agreement.

**Section 11.02 Board of Pharmacy and Other Agencies Notifications of Change in Officers and/or Directors**. Upon Closing, Buyer shall prepare, and file on the Company's behalf, notifications to the New York Board of Pharmacy of the change in the ownership of the Company. As soon as practicable after the Closing, Buyer and Company shall file applications with the Medicaid and Medicare in connection with the transfer of ownership in the Company as contemplated by this Agreement.

**Section 11.03 Other Deliveries**. Buyers shall deliver or cause to be delivered such other documents and instruments as may reasonably be requested by Seller or be required under any relevant rules or regulations of any administrative agencies governing the operation and affairs of a retail pharmacy in the state of New York, to consummate the transaction contemplated hereby.

**Section 11.04 Headings**. The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

**Section 11.05 Severability**. If any term or provision of this Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction.

**Section 11.06 Entire Agreement**. This Agreement sets forth all promises, agreements, conditions, inducements and understandings between and among the parties and there are no promises, agreements, conditions, inducements, warranties, representations, oral or written, express or implied, between them, other than as herein set forth. This Agreement shall not be modified or amended in any manner except by an instrument in writing executed by the Parties.

**Section 11.07 Successors and Assigns**. This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns. Neither party may assign its rights or obligations hereunder without

the prior written consent of the other party, which consent shall not be unreasonably withheld or delayed. No assignment shall relieve the assigning party of any of its obligations hereunder.

**Section 11.08 No Third-party Beneficiaries**. This Agreement is for the sole benefit of the parties hereto and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other person or entity any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

**Section 11.09 Amendment and Modification**. This Agreement may only be amended, modified or supplemented by an agreement in writing signed by each party hereto.

**Section 11.10 Waiver**. No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving. No waiver by any party shall operate or be construed as a waiver in respect of any failure, breach or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver. No failure to exercise, or delay in exercising, any right, remedy, power, or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

**Section 11.11 Waiver of Jury Trial**. Each party acknowledges and agrees that any controversy which may arise under this Agreement is likely to involve complicated and difficult issues and, therefore, each such party irrevocably and unconditionally waives any right it may have to a trial by jury in respect of any legal action arising out of or relating to this Agreement or the transactions contemplated hereby.

**Section 11.12 Counterparts**. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

**Section 11.13 Competent, Knowing, Voluntary Acceptance; Advice of Counsel; No Construction Against Draftsmen.** Each party represents and warrants that such party: (i) is legally competent; (ii) understands and accepts the nature, terms, and scope of this Agreement with full knowledge of all material facts related thereto; and (iii) did not execute this Agreement under coercion or duress of any kind whatsoever. Each party

also affirms and acknowledges that such party has consulted with or been given the opportunity to consult with an attorney regarding the provisions of this Agreement and understands the legal import thereof. The parties acknowledge that in no event shall the terms hereof be construed against any party on the basis that such party, or its counsel, drafted this Agreement.

**Section 11.14 Notice.** Any and all notices required hereunder or otherwise relating to this Agreement shall be delivered to each Party's counsel in a signed, dated writing delivered by either registered mail, hand delivery, facsimile, or electronic mail (e-mail) at the addresses listed below for each respective Party's counsel:

For Buyer:

Vazquez Heldman LLC
ATTN: Jeffrey Heldman, Esq. & Peter Vazquez, Jr., Esq.
18 Hook Mtn. Rd.
Suite 201
Pine Brook, New Jersey 07058
Fax: 973.434.7063
E.: jheldman@vazquezfirm.com
E.: pvazquez@vazquezfirm.com

For Seller:

Suri Law PLLC
ATTN: Sohela Suri, Esq.
626 Rexcorp Plaza
Suite 606
Uniondale, New York 11556
Fax: 212.616.8480
E.: sohela@surilawpllc.com
E.: admin@surilawpllc.com

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the day and year last set forth below.

BUYER:

maiqbal

MUHAMMAD ASSAD IQBAL

SELLER:

ID cLqzAYCaCLprrPYdJT3pEiLq

MELISSA DOBSON

Dated: 01 / 31 / 2025                    Dated: 2/6/2025

 Audit trail

| | |
|---|---|
| **Title** | Contract |
| **File name** | Stock_Purchase_Ag...Seller_Clean_.pdf |
| **Document ID** | 05cd6a8d4b8f0f2e941c98307c633ec978adec37 |
| **Audit trail date format** | MM / DD / YYYY |
| **Status** | ● Signed |

## Document History

| | | |
|---|---|---|
| SENT | **01 / 31 / 2025**<br>15:23:41 UTC | Sent for signature to Muhammad Assad Iqbal (iqbalassad@hotmail.com) from pvazquez@vazquezfirm.com<br>IP: 172.58.123.75 |
| VIEWED | **01 / 31 / 2025**<br>16:01:34 UTC | Viewed by Muhammad Assad Iqbal (iqbalassad@hotmail.com)<br>IP: 172.56.165.252 |
| SIGNED | **01 / 31 / 2025**<br>16:02:03 UTC | Signed by Muhammad Assad Iqbal (iqbalassad@hotmail.com)<br>IP: 172.56.165.252 |
| COMPLETED | **01 / 31 / 2025**<br>16:02:03 UTC | The document has been completed. |

**BILL OF SALE**

This Bill of Sale is entered into on **February 4, 2025** by **MELISSA DOBSON**, an individual with an address of [redacted] ("Seller"), in favor of **MUHAMMAD ASSAD IQBAL**, an individual with an address of **2 Stubbe Drive, Stony Point, NY 10980** ("Buyer"). This Bill of Sale is made pursuant to the **stock purchase agreement** (the "Agreement") by and between Seller and Buyer, to transfer shares of common stock (the "Shares"), of **HEALTH HAVEN CORP.**, a New York corporation (the "Company").

1. **Conveyance**. For good and valuable consideration in the amount of **$1.00** and other good and valuable consideration described in the Agreement, the receipt and adequacy of which Seller hereby acknowledges, Seller hereby irrevocably sells, assigns, transfers, conveys, grants, bargains, and delivers to Buyer, all of its right, title, and interest in and to the Shares which constitute all of Seller's shares of common stock of the Company.

2. **Representations and Warranties.** Seller represents and warrants that (1) Seller is conveying good and valid title to the Shares, free and clear of all encumbrances, debts, mortgages, attachments, pledges, charges, claims, and liens of any kind; (2) Seller has the right to sell the Shares to Buyer and shall warrant and defend the right against the lawful claims and demands of all persons in accordance with the terms and conditions of the Agreement; and (3) that Buyer is now the owner **one hundred percent (100%)** of the issued and outstanding shares of the Company's common stock.

**3.** **Further Assurances**. Buyer and Seller for themselves, their successors and assigns, hereby covenant and agree that, at any time and from time to time on written request, Buyer or Seller will do, execute, acknowledge and deliver or cause to be done, executed, acknowledged, and delivered, all such further acts, deeds, assignments, transfers, conveyances, powers of attorney, and assurances as may be reasonably required by Buyer or Seller in order to assign, transfer, set over, convey, assure and confirm unto and vest in Buyer, its successors and assigns, title to the Shares conveyed and transferred by this Bill of Sale.

**4.** **Governing Law**. This Bill of Sale is governed by, and construed in accordance with, the laws of the State of New York.

5. **Incorporation of Agreement**. This Bill of Sale incorporates by reference all of the terms of the Agreement, including but not limited to the Buyer's and Seller's representations, warranties, covenants and agreements relating to the Shares, as if each term was fully set forth herein.

**6.** **Counterparts**. This Bill of Sale may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Bill of Sale delivered by facsimile, e-mail

or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Bill of Sale.

IN WITNESS WHEREOF, Seller and Buyer have each duly executed and delivered this Bill of Sale on the date first written above.

ID cLqzAYCaCLprrPYdJT3pEiLq

Dated: 2/6/2025 **MELISSA DOBSON**

Dated: 02/04/2025 **MUHAMMAD ASSAD IQBAL**

# IRREVOCABLE STOCK POWER

FOR VALUE RECEIVED, the undersigned does hereby sell, assign and transfer to **MUHAMMAD ASSAD IQBAL**, a total of **one hundred (100)** shares of common stock of **HEALTH HAVEN CORP.** held in the name of **MELISSA DOBSON** representing **one hundred percent (100%)** of the issued and outstanding shares of **HEALTH HAVEN CORP.**

**MELISSA DOBSON** hereby irrevocably constitutes and appoints the Company's secretary, or its agent, as attorney-in-fact to transfer the said shares on the books of the Company and to issue certificates to **MUHAMMAD ASSAD IQBAL** reflecting the transfer of the Shares in accordance with this Stock Power.

IN WITNESS HEREOF, the party below has executed this Irrevocable Stock Power as of the date indicated by signature below.

ID cLqzAYCaCLprrPYdJT3pEiLq

**MELISSA DOBSON**

Dated: 2/6/2025

**RESOLUTION OF HEALTH HAVEN CORP.**

The undersigned sole stockholder of **HEALTH HAVEN CORP.** (the "Company"), does hereby consent to and adopt the following resolutions, which shall have the same force and effect as if taken by an affirmative vote at a meeting of the stockholders duly called and held, and direct that this written consent be filed with the minutes of the proceedings of the Company.

**Transfer of Shares**

WHEREAS, **MELISSA DOBSON** desires to transfer all of their shares of stock in the Company to **MUHAMMAD ASSAD IQBAL**; it is therefore

RESOLVED, that the transfer by **MELISSA DOBSON** of all **one hundred (100)** of her shares of stock in the Company to **MUHAMMAD ASSAD IQBAL** be, and hereby is, authorized, approved, confirmed, and ratified; and it is further

RESOLVED, that as a result of such transfer, **MUHAMMAD ASSAD IQBAL** shall own **one hundred percent (100%)** of the shares of stock in the Company.

**Banking Resolution**

WHEREAS, **MELISSA DOBSON** desires to transfer signatory authority on all of the Company's bank accounts to **MUHAMMAD ASSAD IQBAL**; it is therefore

RESOLVED, that **MUHAMMAD ASSAD IQBAL** is hereby authorized by the Company to serve as signatory on the any existing bank accounts and open any new bank accounts for the Company; and it is further

RESOLVED, that **MUHAMMAD ASSAD IQBAL** may execute other agreements, including, but not limited to, special depository agreements, and arrangements concerning the manner, condition, and/or purposes for which funds, checks, debits, or items of the Company may be deposited, collected, or withdrawn.

**General Authority**

WHEREAS, it is in the best interests of the Company that **MUHAMMAD ASSAD IQBAL** be granted the authority to execute any actions necessary to effectuate the foregoing resolutions; it is therefore

RESOLVED, that **MUHAMMAD ASSAD IQBAL** is hereby authorized and directed to execute and deliver any and all documents and to take such other action as they deem necessary, advisable or appropriate to carry out the purposes and intent of the foregoing resolutions.

ID cLqzAYCaCLprrPYdJT3pEiLq

**MELISSA DOBSON**

Dated: 2/6/2025

2 of 2

Paramount Pharmacy Group LLC v. Iqbal
Case No. 7:25-cv-04780-CS
Exhibit 5 - Page 27 of 36

**RESIGNATION OF MELISSA DOBSON**

**FROM HEALTH HAVEN CORP.**

In accordance with the Stock Purchase Agreement dated **February 4, 2025**, (the "Agreement") the undersigned hereby resigns any position that the undersigned may have had with **HEALTH HAVEN CORP.**, a New York For-Profit Corporation (the "Company") of any nature or description (President, Secretary, Treasurer, Board Member, Employee, etc.). Moreover, the undersigned represents and warrants that except for the consideration paid for her shares in the Company (plus adjustments as set forth in a Closing Statement of even date herewith, if any), that undersigned is not entitled nor shall undersigned make any claims for any additional compensation whether for salary, benefits, or other benefits of any nature or description. The effective date of the resignation is **February 4, 2025**.

ID cLqzAYCaCLprrPYdJT3pEiLq

**MELISSA DOBSON**

Dated: 2/6/2025

**ASSIGNMENT AND ASSUMPTION OF PROMISSORY NOTE**

This Assignment and Assumption Agreement (the "Agreement"), effective as of **February 4, 2025** (the "Effective Date"), is by and between **MELISSA DOBSON** ("Assignor"), and **MUHAMMAD ASSAD IQBAL** ("Assignee").

WHEREAS, Assignor is the maker of that certain promissory note dated **June 25, 2024** in the principal amount of **$200,000** (the "Note") payable to the order of **Richard Sperrezza**; and

WHEREAS, Assignor desires to assign all of its rights, title, and interest in and to the Note, and to delegate all of its obligations and liabilities under the Note, to Assignee;

WHEREAS, Assignee desires to assume all rights, title, and interest in, and obligations and liabilities under, the Note from Assignor;

NOW, THEREFORE, in consideration of the mutual covenants, terms and conditions set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1. Assignment of the Note. Assignor hereby assigns, transfers, and conveys to Assignee all of Assignor's rights, title, and interest in and to the Note, subject to the terms and conditions of this Agreement.

2. Assumption of the Note. Assignee hereby accepts the assignment of the Note and assumes and agrees to pay, perform, and discharge all obligations and liabilities of Assignor under the Note as of the Effective Date of this Agreement.

3. Representations of Assignor. Assignor represents and warrants to Assignee that: (a) Assignor is the sole legal and beneficial owner of the Note and has full power and authority to assign the Note to Assignee; (b) The Note is valid, binding, and enforceable in accordance with its terms, and no default exists under the Note; and (c) Assignor has obtained all necessary consents and approvals to execute and deliver this Agreement.

4. Representations of Assignee. Assignee represents and warrants to Assignor that: (a) Assignee has full power and authority to assume the obligations and liabilities under the Note; (b) Assignee has obtained all necessary consents and approvals to execute and deliver this Agreement; and (c) Assignee is financially capable of fulfilling the obligations under the Note.

5. Indemnification. In the event of a breach of any of the representations or warranties made by any party, the party in breach shall upon demand, defend, indemnify and hold harmless the non-breaching party from any and all claims relating or

referring thereto and any and all lawsuits resulting or arising therefrom such breach, including without limitation, all expenses and reasonable attorneys fees incurred.

6. Further Assurances. Each of the parties hereto shall execute and deliver, at the reasonable request of the other party hereto, such additional documents, instruments, conveyances and assurances and take such further actions as such other party may reasonably request to carry out the provisions hereof and give effect to the transactions contemplated by this Agreement.

IN WITNESS WHEREOF, the parties have executed this Agreement to be effective as of the date first above written.

ASSIGNOR:

ID cLqzAYCaCLprrPYdJT3pEiLq

MELISSA DOBSON

ASSIGNEE:

MUHAMMAD ASSAD IQBAL

**NON-COMPETITION AND NON-SOLICITATION AGREEMENT**

This Non-Competition and Non-Solicitation Agreement (the "Agreement"), effective as of **February 4, 2025** (the "Effective Date"), is by and between **MELISSA DOBSON** ("Seller"), **MUHAMMAD ASSAD IQBAL** ("Buyer"), and **HEALTH HAVEN CORP. d/b/a Prescription Plus Pharmacy** (the "Company"). (collectively the "Parties")

WHEREAS, the Seller has agreed to sell and the Buyer has agreed to purchase all issued and outstanding shares of the Company pursuant to a Stock Purchase Agreement dated **February 4, 2025**(the "Stock Purchase Agreement");

WHEREAS, as a condition of the transaction and to protect the goodwill and competitive interests of the Company, the Seller has agreed to certain restrictions on competition and solicitation as set forth herein;

NOW, THEREFORE, in consideration of the mutual covenants, terms, and conditions set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1. Non-Competition. For a period of **two (2) years** commencing on the date hereof (the "Restricted Period"), the Seller covenants and agrees that the Seller shall not, directly or indirectly, re-establish, re-open, become engaged, employed, or in any other manner whatsoever hold any financial interest, directly or indirectly, in the pharmacy business (including but not limited to a retail pharmacy, provision of pharmacy services to any nursing homes or any other facility of any nature or description, or to individuals) within a **five (5)-mile radius** of the Company's business premises located at **105 Croton Ave., Ossining, NY 10562** (the "Restricted Area").

2. Non-Solicitation. During the Restricted Period, the Seller shall not, directly or indirectly, interfere with, disrupt or attempt to disrupt the relationship between the Company and any person or entity which on the date hereof is a customer, employee or agent of the Company, including specifically contacting an employee of the Company to induce or encourage such employee to leave his or her employment with the Company or to breach his or her employment obligations to the Company. Further, during the Restricted Period, the Seller shall not, directly or indirectly, solicit or attempt to solicit any business partner of the Company with whom the Company had a business relationship as of the date hereof or during the six (6) months preceding such solicitation, for the purpose of inducing such business partner to terminate or alter its relationship with the Company.

3. Blue Pencil. If a court of competent jurisdiction should deem any of the above restrictions to be unreasonable or unenforceable, then the Parties agree to submit to any reduction or modification of such restrictions as the court shall deem reasonable.

4. Remedies. Seller acknowledges that any breach of this Agreement would result in irreparable harm to the Buyer and the Company for which monetary damages may be inadequate. Accordingly, the Buyer and the Company shall be entitled to seek injunctive relief in addition to any other remedies available at law or in equity.

5. Severability. If any provision of this Agreement is held to be invalid or unenforceable by a court of competent jurisdiction, the remaining provisions shall remain in full force and effect and shall be construed so as to effectuate the intent of the parties.

IN WITNESS WHEREOF, the parties have executed this Agreement to be effective as of the date first above written.

SELLER:

ID cLqzAYCaCLprrPYdJT3pEiLq

MELISSA DOBSON

BUYER & COMPANY:

MUHAMMAD ASSAD IQBAL

HEATH HAVEN CORP.
By: Muhammad Assad Iqbal

**HEALTH HAVEN CORP.**
**d/b/a Prescription Plus Pharmacy**
**105 Croton Ave.**
**Ossining, NY 10562**

January 21, 2025

United States Drug Enforcement Administration
New York Division Office
99 10th Avenue
New York, NY 10011

**Re:** **Melissa Dobson to Muhammad Assad Iqbal**
**DEA Number: FH6398932**

To Whom It May Concern:

In accordance with CFR Section 1301.52, please accept this letter as notice that **MELISSA DOBSON** intends to sell the pharmacy and related business activities to others, who will continue to operate the pharmacy as **Prescription Plus Pharmacy**. Please take notice of the following:

1. The registrant discontinuing the business is **Prescription Plus Pharmacy**, operating at **105 Croton Ave., Ossining, NY 10562**. The registration number is **FH6398932**;
2. The persons/entity acquiring the business is **Muhammad Assad Iqbal** with an address of **2 Stubbe Drive Stony Point, NY 10980** . The business activity shall be retail pharmacy. The registration has not yet been obtained. The initial operation shall be pursuant to the existing registration number of **FH6398932**;
3. The business activities will continue at the location presently registered by persons discontinuing business;
4. The registrant-transferor does not have a quota to manufacture or procure any controlled substance listed in Schedule I or II; and
5. The transfer of controlled substances is anticipated to occur on or about **February 4, 2025**.

If the registrant does not receive formal notice that the transfer may not take place, it will distribute the controlled substances in its possession in accordance with applicable regulations. A complete inventory of all transferred controlled substances shall be taken on the day of closing, which shall serve as the final inventory of the registrant to the transferees. Thereafter, and until the New Jersey Pharmacy Permit and CDS registration are issued, the new owners will operate the retail pharmacy under the existing permit and registration number.

If you have any questions or require further information, please contact me as soon as possible.

Very truly yours,

ID cLqzAYCaCLprrPYdJT3pEiLq

**MELISSA DOBSON**

**HEALTH HAVEN CORP.**
**d/b/a Prescription Plus Pharmacy**
**105 Croton Ave.**
**Ossining, NY 10562**

January 21, 2025

National Council for Prescription Drug Programs
9240 East Raintree Drive
Scottsdale, AZ 85260

**Re: Melissa Dobson to Muhammad Assad Iqbal**
**NCPDP Number: 5818034**

To Whom It May Concern:

Effective today, I have transferred ownership of the above pharmacy business to **Muhammad Assad Iqbal** pursuant to a **Stock Purchase Agreement**.

This will serve to advise that the buyer has my permission, as seller, to continue to use the existing NCPDP number of **Health Haven Corp. d/b/a/ Prescription Plus Pharmacy** and/or myself.

Should you have any questions, please do not hesitate to contact me at the above address.

Very truly yours,

ID cLqzAYCaCLprrPYdJT3pEiLg

**MELISSA DOBSON**

# eSignature Details

**Signer ID:** **cLqzAYCaCLprrPYdJT3pEiLq**
Signed by: Melissa Dobson
Sent to email: [redacted]
IP Address: [redacted]
Signed at: Feb 6 2025, 8:51 pm EST