**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| PARAMOUNT PHARMACY GROUP LLC, | Case No. 7:25-cv-04780-CS |
| Plaintiff, | |
| v. | Hon. Cathy Seibel, U.S.D.J. |
| MUHAMMED ASSAD IQBAL, | |
| Defendant. | |

**PLAINTIFF'S REPLY BRIEF IN FURTHER SUPPORT OF MOTION FOR**
**PRELIMINARY INJUNCTION**

Plaintiff Paramount Pharmacy Group LLC ("Paramount" or "Plaintiff"), respectfully submits this reply brief in further support of its motion for a preliminary injunction requiring Defendant Muhammed Assad Iqbal ("Iqbal" or "Defendant") to execute all necessary documentation to consummate a transfer of Health Haven Corp. d/b/a Prescription Plus Pharmacy ("Health Haven") from Iqbal's control to Paramount, and for Iqbal to vacate the physical pharmacy premises, turn over all keys, passwords, and otherwise assist in the transition of the business to Paramount, the rightful owner.

**PRELIMINARY STATEMENT**

Defendant's opposition is a transparent attempt to rewrite history and evade the consequences of his contractual commitments, which he has since willfully breached. After accepting a loan from Paramount to purchase Health Haven—a business he could not have acquired otherwise—Iqbal now concocts a story of fraud and misunderstanding to justify his blatant breaches of multiple, unambiguous agreements. He received the full benefit of his bargain: ownership of Health Haven, financed entirely by Paramount. Now, having defaulted on

his obligations, he seeks to retain the asset, while simultaneously claiming the very agreements that gave it to him are void.

The facts, grounded in the executed contracts before this Court, are clear. Iqbal defaulted under the agreements between the parties by failing to pay back Paramount under the Security Agreement for its loan to Iqbal, and by failing to compensate Paramount for services rendered under the Management Services Agreement. The agreements dictate the consequences of that default: the transfer of Health Haven's shares to Paramount, and the ability for Paramount to enter Health Haven and take possession of the collateral, which encompasses Health Haven, its fixtures and personal property, and all proceeds and products of Health Haven, including all supporting obligations, which the requested relief encompasses. In short, the relief Paramount seeks is the precise remedy the parties bargained for. For the reasons set forth below, and in its moving papers, Paramount respectfully requests that the Court grant the preliminary injunction to prevent the complete destruction of its collateral and enforce the plain terms of the parties' agreements.

## BACKGROUND AND STATEMENT OF FACTS

The central facts of this matter are straightforward and well-documented. On or about February 4, 2025, Paramount and Iqbal entered into a series of integrated agreements to finance Iqbal's purchase of Health Haven. Paramount agreed to loan Iqbal $556,788.56, memorialized in a Secured Promissory Note ("Note"). See Verified Petition ("Pet.") ¶¶ 5-8; Def. Opp., Ex. 1. The funds were used by Iqbal to purchase all shares of Health Haven from a third-party. See Pet. ¶ 8.

To protect its substantial investment, Paramount obtained security for the loan, which Iqbal freely pledged. See "Security Agreement;" Def. Opp., Ex. 2. The Security Agreement granted Paramount a security interest in, among other things, all shares of Health Haven Corp.

and all assets of Health Haven. See Pet. ¶¶ 10-11, 24; Def. Opp., Ex. 2. The parties concurrently executed an Escrow Agreement, under which the share certificate for Health Haven Corp. was placed with a neutral escrow agent. See Pet. ¶ 12; Def. Opp., Ex. 3.

The agreements expressly provide that upon an "Event of Default," the escrow agent was to release the shares to Paramount, thereby transferring ownership. See Pet. ¶¶ 20, 27. The "Remedies Upon Default" under the Security Agreement, require Iqbal, upon an "Event of Default" to allow Paramount to "peaceably by its own means or with judicial assistance enter the Grantor's premises and take possession of the Collateral without prior notice to the Granter or the opportunity for a hearing." Security Agreement, Ex. 2, at § 71 (emphasis added).

Further, the parties entered into a Management Services Agreement ("MSA") to ensure the professional operation of Health Haven and safeguard Paramount's collateral. See Pet. ¶¶ 13-14; Def. Opp., Ex. 4. The agreements are unequivocally linked; termination of the MSA constitutes an Event of Default under the Note. See Pet. ¶ 18. Iqbal explicitly warranted that all agreements were "duly authorized, executed and delivered by Grantor and constitute a legal, valid and binding obligation of the Grantor enforceable in accordance with its terms." See Pet. ¶ 25; Def. Opp., Ex. 2, § 5.4. Defendant Iqbal breached these agreements wantonly.

On or about April 22, 2025, Iqbal unilaterally terminated the MSA and revoked the Power of Attorney granted to Paramount. See Pet. ¶ 30. He locked Paramount out of the business, revoking all access to the premises, financial accounts, software, and security systems. See Pet. ¶ 31. This action constituted a clear Event of Default under the Note (§ 9(g)), and a material breach of the MSA § 3.3, § 11. See Pet. ¶¶ 34-36. To date, Iqbal has not made a single payment on the Note. See Pet. ¶ 77.

Following these defaults, Paramount acted precisely as the agreements allowed. After providing notice to Iqbal, <u>see</u> Pet. ¶¶ 51-52, Paramount directed the escrow agent to release the share certificate, which was done on May 13, 2025. <u>See</u> Pet. ¶¶ 53, 56; Def. Opp., Ex. 6, at 8. Despite the transfer of ownership, Iqbal has refused to vacate the premises, turn over control of the business, or execute the necessary documents to finalize the transfer. <u>See</u> Pet. ¶ 57. Instead, he continues to operate Health Haven, running it into the ground by failing to maintain regular business hours, alienating customers, and, upon information and belief, diverting its revenue for his personal use. <u>See</u> Pet. ¶¶ 38-42.

## <u>ARGUMENT</u>

Under the established standard in the Second Circuit, a party seeking a preliminary injunction is required to demonstrate: "(1) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor; and (2) irreparable harm in the absence of the injunction." <u>Faiveley Transport Malmo AB v. Wabtec Corp.</u>, 559 F.3d 110, 116 (2d Cir. 2009). Paramount satisfies this standard in its entirety.

Defendant's opposition argues that Plaintiff's requested injunction is a mandatory injunction, seeking to change the status quo by "commanding some act." <u>See</u> Def. Opp., at 7. Defendant is incorrect, as the relief Plaintiff is requesting here is not a mandatory injunction. Plaintiff is not asking for any more relief beyond what is required in the contractual agreement between the parties, and is therefore not seeking an alteration of the status quo. <u>See</u> <u>Tom Doherty Assocs. v. Saban Entm't, Inc.</u>, 60 F.3d 27, 34 (2d Cir. 1995).

Simply put, Plaintiff requests enforcement of the terms of the security agreement, management services agreement, and promissory note, which establish that Paramount has

ownership and control over Health Haven Pharmacy due to Defendant Iqbal's breach, and that Iqbal is prohibited from doing any action which would further breach the agreements or harm the secured collateral. As a result, Plaintiff may prevail in its request for a preliminary injunction by demonstrating irreparable harm, as well as either success on the merits, or sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor. Tom Doherty Assosc., 60 F.3d at 34. Under either standard, Plaintiff should prevail.

## I.    PLAINTIFF IS LIKELY TO SUCCEED ON ITS CLAIMS

Paramount has demonstrated more than a mere likelihood of success; it has presented sufficient evidence of its right to relief under each of the claims sought. Paramount need not show likelihood of success on the merits on each of its claims; it is sufficient to show success on the merits of at least one of its claims. L.V.M. v. Lloyd, 318 F. Supp. 3d 601, 618 (S.D.N.Y. 2018) (emphasis added). Nevertheless, Paramount has clearly demonstrated likelihood of success on all three of its claims in its complaint: (1) Breach of contract of the Security Agreement, the MSA, and the Note; (2) Tortious interference by Iqbal upon the MSA between Paramount and Health Haven; and (3) Conversion of Paramount's interest in the physical Health Haven pharmacy, its bank accounts and assets, its furniture and fixtures, and its inventory.

Iqbal's breaches of contract are explicit and undisputed. Iqbal unilaterally terminated the MSA and Power of Attorney. Pet. ¶ 30, actions defined as an "Event of Default" in the Note. See Pet. ¶¶ 18, 34-36. Iqbal has failed to make any payments on the $556,788.56 loan. See Pet. ¶ 77. Defendant's defense of "lack of consideration" is absurd on its face. The consideration was the loan money that allowed him to purchase Health Haven in the first place. His claim of "fraud in the factum" is equally baseless and self-serving. Iqbal, who was represented by counsel, signed

agreements that explicitly state they are "legal, valid and binding" and now conveniently claims he did not understand them. <u>See</u> Pet. ¶ 25. The contracts are clear, the breach is clear, and Paramount's right to enforce the default provisions is irrefutable.

Paramount further provided sufficient facts to show likelihood of success on the merits of its tortious interference claim. To state a claim for tortious interference, a party must allege: (1) it had a business relationship with a third party; (2) the defendant knew of that relationship and intentionally interfered with it; (3) the defendant acted solely out of malice, or used dishonest, unfair, or improper means; and (4) the defendant's interference caused injury to the relationship. <u>Kirch v. Liberty Media Corp.</u>, 449 F.3d 388, 400 (2d Cir. 2006).

Paramount had a valid contract with Health Haven Corp., the MSA. <u>See</u> Pet. ¶ 80. Iqbal, as an individual, knew of this contract because he signed the MSA on the corporation's behalf. <u>See</u> Pet. ¶ 81. He then intentionally and personally procured Health Haven's breach of the MSA by terminating the MSA without justification. <u>See</u> Pet. ¶ 82. This interference directly damaged Paramount by depriving it of its management role and the associated fees.

Finally, Plaintiff has demonstrated likelihood of success on the merits of its conversion claim. A conversion takes place when someone, intentionally and without authority, assumes or exercises control over personal property belonging to someone else, interfering with that person's right of possession. <u>Hillcrest Homes, LLC v. Albion Mobile Homes, Inc.</u>, 117 A.D.3d 1434, N.Y.S.2d 755, 757 (4th Dept. 2014). The tort of conversion "does not require defendant's knowledge that he is acting wrongfully, but merely an intent to exercise dominion or control over property in a manner inconsistent with the rights of another." <u>See</u> <u>LoPresti v. Terwilliger</u>, 126 F.3d 34, 36 (2d Cir. 1997).

As of May 13, 2025, upon the release of the shares from escrow pursuant to the Security Agreement, Paramount became the rightful legal owner of Health Haven. <u>See</u> Pet. ¶ 63. Despite demands by Paramount to Iqbal to vacate the premises, and to execute documents which would effectuate the transfer of ownership of the pharmacy in the eyes of providers and wholesalers, Iqbal continues to unlawfully occupy Health Haven, exercise control over its bank accounts and assets, and deny possession to Paramount. <u>See</u> Pet. ¶¶ 57, 64-65. This is the textbook example of conversion.

As for the money and personal property which Paramount alleges Iqbal converted, as the Second Circuit has held, "[a]n action will lie under New York law for conversion of money where there is an obligation to return or otherwise treat in a particular manner the specific money in question." <u>LoPresti</u>, 126 F.3d at 41. Upon information and belief, Iqbal has diverted revenue for his personal use, and has refused to pay the proceeds of any sales to Paramount. <u>See</u> Pet. ¶¶ 38-42. Paramount is likely to succeed on its conversion claim based on the facts in its Petition.

Moreover, the existence of duly executed contracts and Iqbal's admitted actions to terminate them, present, at a minimum, "sufficiently serious questions going to the merits to make them a fair ground for litigation." <u>LeSportsac, Inc. v. K Mart Corp.</u>, 754 F.2d 71, 74 (2d Cir. 1985). In addition, the balance of hardships tips decidedly in Paramount's favor. Without an injunction, Paramount stands to lose its entire $556,788.56 investment, plus a subsequent $50,000 infusion, <u>see</u> Pet. ¶ 75, and will also see the collateral securing that loan be systematically destroyed by its defaulting borrower. The value of Health Haven is being eroded daily by Iqbal's mismanagement, loss of goodwill, and diversion of assets. <u>See</u> Pet. ¶¶ 39-41.

The hardship to Iqbal, by contrast, is the direct result of his own default. He would be required to relinquish control of a business he acquired with funds he has not repaid and is

contractually obligated to forfeit upon default. He cannot claim hardship from the enforcement of the very bargain he made. Any harm to him is self-inflicted, whereas the harm to Paramount is unjust and inequitable.

## II.    PARAMOUNT WILL SUFFER IRREPARABLE HARM

The harm here is not merely monetary; it is the ongoing destruction of the business itself, which is also Paramount's primary collateral under the securitized loan proffered to Defendant Iqbal. Plaintiff has alleged significant harm to Health Haven Pharmacy if Iqbal is allowed to continue operating Health Haven despite his breach of the MSA, the Note, and the Security Agreement. As the Second Circuit has recognized, the "threatened loss of good will and customers" constitutes irreparable harm. Jacobson & Co. v. Armstrong Cork Co., 548 F.2d 438, 445 (2d Cir. 1977). Every day Iqbal remains in control, Health Haven's reputation with patients, doctors, and suppliers is damaged; goodwill that cannot be repaired with a monetary judgment. See Pet. ¶ 40.

Furthermore, the collateral securing the loan, including the stock, inventory, fixtures, and proceeds of Health Haven, is being dissipated and devalued. See Pet. ¶¶ 41, 65. With each day that Iqbal damages Health Haven's reputation, and his management of Health Haven causes regular customers to take their business elsewhere, the Health Haven stock owned by Paramount becomes worthless and the physical inventory and fixtures of Health Haven are at risk of being liquidated or removed. This impairment of a bargained-for security interest is a classic form of irreparable harm. Paramount is not merely a creditor seeking payment; it is a secured lender watching its collateral vanish before it has a chance to prove its case. See Citibank, N.A. v. Singer Co., 684 F. Supp. 382, 385-86 (S.D.N.Y. 1988) (irreparable harm found where a credit

agreement required provision of security on lender's request, and the borrower refused to provide that security.) This is precisely the scenario for which injunctive relief is designed.

## **CONCLUSION**

Paramount has met its burden of showing that the preliminary injunction requested is necessary. It has shown a clear likelihood of success on the merits based on the unambiguous contracts executed by the Parties, and the undisputed breach of those contracts by Defendant Iqbal. It has demonstrated irreparable harm through the ongoing destruction of its collateral by a "squatter" that is attempting to gain ownership of a business through "adverse possession," including the loss of goodwill, reputation and customer relationships. Accordingly, for all of the foregoing reasons, Paramount's application should be granted.


Dated: June 26, 2025

                              Respectfully submitted,


                              */s/ Anthony J. Mahajan*
                              Anthony J. Mahajan
                              **HEALTH LAW ALLIANCE LLC**
                              51 John F. Kennedy Parkway
                              Short Hills, NJ 07078
                              Telephone: (800) 345-4125
                              amahajan@healthlawalliance.com